**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ENCORE MEDICAL, L.P., )
)
    Plaintiff/Counterclaim Defendant, )
)
    v. )    CIVIL ACTION NO. 3:12-58
)    JUDGE KIM R. GIBSON
JAY KENNEDY, D.C., )
)
    Defendant/Counterclaimant, )
)
    v. )
)
GEOFFREY MISCOE; MIR-COM )
PRODUCTS, L.L.C.; BRYANNE )
ENTERPRISES, INC.; *and* MIG )
RUNNER, L.L.C., *a/k/a MRP*, )
)
    Defendants. )

## MEMORANDUM OPINION AND ORDER OF COURT

### I. SYNOPSIS

This matter comes before the Court on a motion to vacate filed by the Defendant/Counterclaimant, a motion to dismiss filed by the Plaintiff, and motions for summary judgment filed by the Plaintiff, Defendant/Counterclaimant and remaining Defendants. ECF Nos. 12, 65, 88, 91 & 94. For the reasons that follow, the motion to vacate (*ECF No. 12*) will be granted in part and denied in part. The motion to dismiss (*ECF No. 65*) will be granted. The Plaintiff's motion for partial summary judgment (*ECF No. 94*) will be denied. The Defendants' motions for summary judgment (*ECF Nos. 88 & 91*) will be granted in part and denied in part. In accordance with this Court's order of April 12, 2012, a status conference will be scheduled within twenty-one days of the issuance of this opinion, and the parties will be afforded an opportunity to explain whether "limited additional discovery" is needed. ECF No. 86 at 2.

1

## II. JURISDICTION AND VENUE

The Court has subject-matter jurisdiction over the present dispute pursuant to 28 U.S.C. § 1332(a)(1). Venue is proper under 28 U.S.C. § 1391(b).

## III. BACKGROUND

Plaintiff Encore Medical, L.P. ("Encore"), is a limited partnership organized under the laws of Delaware. ECF Nos. 95 & 98 at ¶ 1. Encore maintains its principal place of business in Austin, Texas. *Id.* The Chattanooga Group was founded in 1947. *Id.* at ¶ 3. At that time, the Chattanooga Group maintained a facility in Hixson, Tennessee, to manufacture orthopedic rehabilitation equipment. *Id.* at ¶ 5. The Chattanooga Group ultimately became the world's largest manufacturer of equipment designed to treat skeletal, muscular, neurological and soft tissue disorders. *Id.* at ¶ 2. Encore purchased the Chattanooga Group in 2002, thereby making the Chattanooga Group a division of Encore. *Id.* at ¶¶ 2, 4. The facility in Hixson closed in 2010, when Encore started to manufacture its products in other locations. *Id.* at ¶¶ 5-6. Encore continues to sell products pertaining to rehabilitation, pain management and physical therapy throughout the world. *Id.* at ¶ 8. The products sold by Encore include chiropractic tables and traction/decompression systems. *Id.* at ¶ 7. In the United States, Encore's products are marketed and sold through a network of distributors. *Id.* at ¶ 9.

Chris Peetros ("Peetros") started working for the Chattanooga Group in 1995. *Id.* at ¶ 14. He became an Encore employee at the time of its acquisition of the Chattanooga Group. *Id.* Peetros' position apparently changed from that of National Sales Manager for the Chattanooga Group to Eastern Regional Sales Director for Encore. *Id.*

2

Dr. Jay Kennedy, D.C., is a licensed chiropractor who resides and practices in Berlin, Pennsylvania. *Id.* at ¶¶ 29-31. He owns and operates Back Pain Solutions Chiropractic, Inc. *Id.* at ¶ 32. Geoffrey Miscoe ("Miscoe") resides in Indian Lake, Pennsylvania. *Id.* at ¶ 33. Dr. Kennedy and Miscoe have been business associates for several years. *Id.* at ¶ 34.

Miscoe owns and operates Bryanne Enterprises, Inc. ("Bryanne"), Mir-Com Products, L.L.C. ("Mir-Com"), and Mig Runner, L.L.C. ("MRP"). *Id.* at ¶ 35. He and his wife, Lori Miscoe, are Bryanne's only shareholders. *Id.* at ¶ 40. Six other individuals are employed by Bryanne. *Id.* at ¶ 41. In 2001 or 2002, Bryanne became one of Encore's dealers for western Pennsylvania. *Id.* at ¶ 42. Miscoe handled Bryanne's dealings with Encore. *Id.* at ¶ 47. Mir-Com and MRP are limited liability companies maintaining their principal places of business in Central City, Pennsylvania. *Id.* at ¶¶ 48, 55. Miscoe is the only member of Mir-Com and MRP. *Id.* at ¶¶ 49, 57.

At some point in 2000 or 2001, Dr. Kennedy spoke with Peetros about their mutual interest in marketing and utilizing chiropractic products. *Id.* at ¶¶ 60-64. On June 25, 2002, Dr. Kennedy and Encore executed a written agreement providing for the marketing and sale of a "traction/decompression belting package" invented by Dr. Kennedy in connection with a "particular traction machine" supplied by Encore.[1] ECF No. 1-1 at 36. The agreement was to continue for a minimum[2] period of ten years, the first four of which were referred to as the "Base Term" and the remainder of which were referred to as the "Extended Term." *Id.* at 36-37. Pursuant to the terms of the agreement, Dr. Kennedy sold his interest in the belting package for

---

[1] Dr. Kennedy signed the agreement on June 24, 2002. ECF No. 1-1 at 41. The agreement was signed by Paul D. Chapman, Encore's "Executive Vice President," on July 5, 2002. *Id.* The parties chose June 25, 2002, as the agreement's "effective date." *Id.* at 36 (capitalization omitted).

[2] The agreement specified that it would continue "for a period of ten years" or until the expiration of a patent obtained by Encore naming Dr. Kennedy "as an inventor or co-inventor." ECF No. 1-1 at 36. Dr. Kennedy transferred his "intellectual property" to Encore. *Id.* at 37 (capitalization omitted).

3

the sum of $5,000.00. *Id.* at 37. Encore agreed to pay Dr. Kennedy $18.00 for every unit of the belting package sold during the Base and Extended Terms. *Id.* Dr. Kennedy was also entitled to a "supplemental payment" for each unit of the traction machine sold with a belting package during the Base Term. *Id.* The supplemental payments were to equal $400.00 for each of the first 100 units sold in a given year of the Base Term and $500.00 for any excess units sold in the same year. *Id.* Encore had the option of terminating the Base Term in the event that it could not sell 100 units in a given year. *Id.* Dr. Kennedy agreed that "any and all inventions, improvements, trade secrets and know-how relating to traction machines . . . and accessories for traction machines . . . that [we]re conceived, made or developed by him" during the Base Term were to "belong exclusively to Encore." *Id.* (capitalization omitted). Any such "inventions, improvements, trade secrets [or] know-how" were to be disclosed to Encore "promptly upon creation." *Id.* Encore also acquired "the right to use and to allow others to use the name, likeness and biographical information of [Dr. Kennedy] for advertising and promotional purposes in connection with sales of the [traction machine] and [belting package]." *Id.* at 39. The agreement included a provision prohibiting Dr. Kennedy from participating in the "creation, development, manufacture, distribution or sale of any product" that was competitive with the traction machine or belting package in the United States during the term of the agreement and a period of two years following its expiration.[3] *Id.*

By entering into the agreement, the parties acknowledged that the rights granted therein were "of a special and unique character," that they were of "peculiar value" to Encore, and that Encore would suffer "irreparable injury" in the event of a breach by Dr. Kennedy. *Id.* It was agreed that Encore would "be entitled to injunctive relief and other equitable relief or damages,

---

[3] The provision prohibiting competitive conduct was not applicable to any conduct engaged in by Dr. Kennedy at Encore's written request, or with Encore's written authorization. ECF No. 1-1 at 39.

in addition to any other rights and remedies available to it," if Dr. Kennedy were to contravene the terms of the agreement. *Id.* A separate provision provided that the agreement was to be "governed by the laws of the State of Tennessee and the United States of America." *Id.* at 40.

In April 2007, Bryanne started to market and sell seminars taught by Dr. Kennedy. *Id.* at ¶ 43. Encore terminated its business relationship with Bryanne in September 2008. ECF Nos. 95 & 98 at ¶ 116; ECF No. 97-1 at ¶ 54. Shortly thereafter, Miscoe spoke with Claude McCormick ("McCormick") of Armedica Manufacturing Corporation ("Armedica") about the possible creation of a new traction table. ECF Nos. 95 & 98 at ¶ 117. Dr. Kennedy and Miscoe traveled to Armedica's facility in Arkansas in order to discuss chiropractic products. *Id.* at ¶ 118. During the visit, Dr. Kennedy lay on a table and made some suggestions as to how it could be improved. *Id.* at ¶¶ 119-121. In February 2009, Dr. Kennedy and Miscoe returned to Armedica's facility and looked at a table that had been designed in accordance with Dr. Kennedy's suggestions. *Id.* at ¶ 122. Mir-Com became the exclusive distributor of the tables manufactured by Armedica and "traction blocks" associated with those tables. *Id.* at ¶ 124 (capitalization omitted). Dr. Kennedy was ultimately retained by Mir-Com to work as an online course instructor. *Id.* at ¶ 126. Mir-Com started to pay Dr. Kennedy a royalty in the amount of $11.00 for every unit of "traction blocks" sold. *Id.* at ¶¶ 127, 129. Dr. Kennedy receives approximately $1,800.00 in royalty payments from Mir-Com in a given year. *Id.* at ¶ 128. At some point, Bryanne began to distribute belts owned by MRP and the tables manufactured by Armedica. *Id.* at ¶¶ 130-131.

Encore commenced this action against Dr. Kennedy in the Circuit Court for Hamilton County, Tennessee, on April 1, 2009, alleging various breaches of the written contract executed on June 25, 2002. ECF No. 97-26 at 2-24. A hearing was held before the Circuit Court on April

5

27, 2009. ECF No. 24-1 at 2. Testimony given by Dr. Kennedy suggested that he had an ownership interest in Mir-Com. ECF No. 97-12 at 3, 9-10, ¶ 8. On May 8, 2009, Mir-Com commenced an action against Dr. Kennedy in the Court of Common Pleas of Somerset County, Pennsylvania, seeking a declaration that Miscoe was its sole owner. *Id.* at 2-5. Dr. Kennedy did not dispute any of Mir-Com's averments. *Id.* at 9-10, ¶¶ 1-10. Mir-Com responded to Dr. Kennedy's admissions by moving for a judgment on the pleadings. *Id.* at 12-13. In an order dated June 24, 2009, the Court of Common Pleas declared Miscoe to be the sole owner of Mir-Com, "to the exclusion of all others." *Id.* at 14.

On June 3, 2009, the Circuit Court temporarily enjoined Dr. Kennedy from designing, developing, advertising, marketing, or selling products that were competitive with those designed, developed, advertised, marketed, or sold by Encore. ECF No. 24-1 at 2-7. Dr. Kennedy filed a motion to dissolve the injunction on June 4, 2010, seeking a declaration that he had never breached his contract with Encore. *Id.* at 9. Although the motion was denied on March 3, 2011, the injunction was modified to correspond with "the prohibitions agreed to by the parties in the contract." *Id.* at 9-11. Specifically, the injunction was narrowed to prohibit the designing, development, advertising, marketing, or selling of products that were competitive with the belting packages and traction machines described in the agreement. *Id.* at 10. The Circuit Court concluded that genuine issues of material fact existed as to whether certain actions taken by Dr. Kennedy had been contrary to his contractual obligations. *Id.* at 9. A trial was scheduled to begin on June 28, 2011. *Id.* at 14. Nonetheless, on June 8, 2011, Encore was granted leave to amend its complaint, thereby causing the trial to be postponed. *Id.* at 13-14. The Circuit Court determined that since the injunction required only that Dr. Kennedy comply

6

with the contract that he had entered into with Encore, he would not be unduly prejudiced by the delay. *Id.* at 14.

Encore amended its complaint on June 15, 2011, and added Miscoe, Bryanne, Mir-Com and MRP as defendants. ECF No. 1 at ¶¶ 2-3. Dr. Kennedy filed a counterclaim in declaratory judgment that same day, seeking a declaration that the portion of the contract governing the development of products competitive with Encore's traction machines had been applicable only during the Base Term of the agreement, and that the provision prohibiting competition with those machines had expired on June 25, 2008. ECF No. 10 at ¶ 5. On July 14, 2011, the new defendants removed the case to the United States District Court for the Eastern District of Tennessee pursuant to 28 U.S.C. §§ 1441 and 1446. ECF No. 1. Dr. Kennedy moved for summary judgment on August 9, 2011, seeking the same determination that he had requested in connection with the counterclaim in declaratory judgment. ECF No. 10. He supplemented the motion for summary judgment with a separate motion to vacate the Circuit Court's injunction. ECF No. 12. On August 22, 2011, Miscoe, Bryanne and MRP moved for the dismissal of Encore's claims pursuant to Federal Rule of Civil Procedure 12(b)(2), contending that the District Court did not have *in personam* jurisdiction over them. ECF No. 21 at 1-2. Those defendants alternatively moved for an order transferring the case to this Court. *Id.* at 2. Mir-Com joined the motion for transfer two days later. ECF No. 25. Dr. Kennedy filed a separate motion to transfer on September 1, 2011, asserting that the matter would be more appropriately handled in the Western District of Pennsylvania. ECF No. 27.

On December 19, 2011, Encore filed an amended complaint and added claims against all five defendants for interfering with its existing or prospective business relationships. ECF No. 48 at ¶¶ 228-242. Miscoe, Bryanne and MRP renewed their motions for dismissal and transfer

on January 3, 2012. ECF No. 52. Mir-Com filed its own motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). ECF No. 54. The basis for the motion was that Mir-Com was not subject to the *in personam* jurisdiction of the District Court, and that the claims added by amendment could not warrant relief. *Id.* at 1-4. Mir-Com also renewed its motion to have the case transferred to this Court. *Id.* at 3. Both Mir-Com and Dr. Kennedy answered the second amended complaint. ECF Nos. 55 & 56.

Dr. Kennedy amended his answer on January 24, 2012, to assert a counterclaim against Encore for abuse of process. ECF No. 60 at 22-37, ¶¶ 1-67. Encore moved for the dismissal of the counterclaim on February 7, 2012. ECF No. 65. In a memorandum opinion and order dated March 21, 2012, the District Court denied the motions filed under Rule 12(b)(2) and granted the alternative motions for transfer. ECF No. 73; *Encore Medical, L.P. v. Kennedy*, 861 F.Supp.2d 886 (E.D.Tenn. 2012). In accordance with the District Court's order, the case was transferred to this Court pursuant to 28 U.S.C. § 1404(a). ECF No. 74.

A status conference was conducted on April 11, 2012. ECF No. 85. The next day, the parties were ordered to file their respective motions for summary judgment by May 14, 2012. ECF No. 86 at 1. It was assumed that the motion for summary judgment filed by Dr. Kennedy prior to the transfer would be subsumed by a subsequent motion. *Id.* The Court acknowledged that Dr. Kennedy's motion to vacate the Circuit Court's injunction and Encore's motion to dismiss Dr. Kennedy's counterclaim were still pending, and that those motions would need to be addressed. *Id.* at 2. On May 14, 2012, Dr. Kennedy and the remaining defendants filed separate motions for summary judgment, seeking the dismissal of all claims contained in the second amended complaint. ECF Nos. 88 & 91. That same day, Encore moved for summary judgment with respect to three of its claims against Dr. Kennedy. ECF No. 94. Dr. Kennedy's motion to

8

vacate, Encore's motion to dismiss, and the three motions for summary judgment filed by the parties are ripe for disposition and will be resolved in this memorandum opinion.

## IV. STANDARDS OF REVIEW

In light of the United States Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), a complaint may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008), quoting *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). This standard requires more than "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. The complaint must allege a sufficient number of facts "to raise a right to relief above the speculative level." *Id.* This requirement is designed to facilitate the notice-pleading standard of Federal Rule of Civil Procedure 8(a)(2), which requires "a short and plain statement of [a] claim *showing* that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2)(emphasis added).

In considering a motion to dismiss filed pursuant to Rule 12(b)(6), a court accepts all of the plaintiff's allegations as true and views all reasonable inferences drawn from those allegations in the light most favorable to the plaintiff. *Buck v. Hampton Township School District*, 452 F.3d 256, 260 (3d Cir. 2006). Nonetheless, a court need not credit bald assertions, unwarranted inferences, or legal conclusions cast in the form of factual averments. *Morse v. Lower Merion School District*, 132 F.3d 902, 906, n. 8 (3d Cir. 1997). The primary question in

9

deciding a motion to dismiss is not whether the plaintiff will ultimately prevail, but rather whether he or she is entitled to offer evidence to establish the facts alleged in the complaint. *Maio v. Aetna*, 221 F.3d 472, 482 (3d Cir. 2000). The purpose of a motion to dismiss is to "streamline[] litigation by dispensing with needless discovery and factfinding." *Neitzke v. Williams*, 490 U.S. 319, 326-327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). In addition to the allegations contained in the complaint, a court may consider matters of public record, exhibits attached to the complaint, and other items appearing in the record of the case. *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384, n. 2 (3d Cir. 1994).

Summary judgment may only be granted where the moving party shows that there is no genuine dispute as to any material fact, and that a judgment as a matter of law is warranted. FED. R. CIV. P. 56(a). Pursuant to Federal Rule of Civil Procedure 56, the Court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In evaluating the evidence, the Court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor. *Watson v. Abington Township*, 478 F.3d 144, 147 (3d Cir. 2007). The burden is initially on the moving party to demonstrate that the evidence contained in the record does not create a genuine issue of material fact. *Conoshenti v. Public Service Electric & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004). A dispute is "genuine" if the evidence is such that a reasonable trier of fact could render a finding in favor of the nonmoving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Where the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the nonmoving party's

burden of proof. *Celotex Corp.*, 477 U.S. at 322. Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories showing that there is a genuine issue of material fact for trial. *Id.* at 324. The nonmoving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his or her pleadings. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

## V. DISCUSSION

The second amended complaint contains eleven counts. ECF No. 48 at ¶¶ 163-246. Four of those counts assert claims only against Dr. Kennedy. *Id.* at ¶¶ 163-187. Six counts purport to assert claims against all five defendants. *Id.* at ¶¶ 199-246. Count V asserts claims only against Miscoe, Bryanne, Mir-Com and MRP. *Id.* at ¶¶ 188-198. Dr. Kennedy's counterclaim for abuse of process is also before the Court. ECF No. 60 at 22-37, ¶¶ 1-67.

### A.    The Terms and Construction of the Contract

Counts I, II and III of the second amended complaint are based on allegations that Dr. Kennedy has breached his contractual obligations to Encore.[4] ECF No. 48 at ¶¶ 163-185. Dr. Kennedy maintains that he has not breached the contract. ECF No. 99 at 6. Before considering whether an actionable breach has occurred, the Court must determine whether the contract should be construed in accordance with Tennessee or Pennsylvania law.[5]

---

[4] Count III of the second amended complaint is based on an assertion that Dr. Kennedy breached his "duty of loyalty" to Encore. ECF No. 48 at ¶¶ 181-185. Encore now concedes that Counts I, II and III can be treated as a single breach-of-contract claim. ECF No. 101 at 17.

[5] Each party to this case appears to favor the wholesale application of either Tennessee or Pennsylvania law. ECF No. 89 at 2-4; ECF No. 92 at 2-6; ECF No. 96 at 6-12. Nevertheless, "choice of law analysis is issue-specific." *Berg Chilling Systems, Inc. v. Hull Corp.*, 435 F.3d 455, 462 (3d Cir. 2006). Although Tennessee law will govern

11

Since jurisdiction in this case is predicated on the diverse citizenship of the parties, the claims asserted by the parties are governed by state law. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). A federal court sitting in diversity normally applies the choice-of-law rules of the State in which it sits. *Klaxon Co. v. Stentor Electric Manufacturing Co., Inc.*, 313 U.S. 487, 496-497, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Nonetheless, the Supreme Court has explained that § 1404(a) "should be regarded as a federal judicial housekeeping measure" that is "generally intended, on the basis of convenience and fairness, simply to authorize a change of courtrooms."[6] *Van Dusen v. Barrack*, 376 U.S. 612, 636-637, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964). For this reason, a transfer ordered pursuant to § 1404(a) "does not change the law applicable to a diversity case." *Ferens v. John Deere Co.*, 494 U.S. 516, 523, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990). Since this case was transferred from the Eastern District of Tennessee, the Court must apply Tennessee's choice-of-law rules in order to identify the substantive law applicable to Encore's breach-of-contract claims. *Amica Mutual Life Insurance Co. v. Fogel*, 656 F.3d 167, 171 (3d Cir. 2011).

Under Tennessee law, a conflict between the laws of competing jurisdictions is a "necessary predicate" to a more extensive choice-of-law analysis. *Armstrong v. United States Fire Insurance Co.*, 606 F.Supp.2d 794, 802 (E.D.Tenn. 2009); *Hataway v. McKinley*, 830 S.W.2d 53, 55 (Tenn. 1992). This policy reflects the fact that a party cannot be injured by the application of a particular jurisdiction's law when that law "is not in conflict with that of any other [interested] jurisdiction." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 816, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). The contract executed by Encore and Dr. Kennedy plainly

---

some issues in this case, other issues will be governed by the law of Pennsylvania. *Encore Medical, L.P. v. Kennedy*, 861 F.Supp.2d 886, 896-897 (E.D.Tenn. 2012).

[6] The applicable statutory provision authorizes transfers that are consistent with "the convenience of the parties" and "the interest of justice." 28 U.S.C. § 1404(a). A civil action may be transferred "to any other district or division where it might have been brought," or "to any district or division to which all parties have consented." *Id.*

12

provides that the parties' agreement "shall be governed by the laws of the State of Tennessee and the United States of America." ECF No. 1-1 at 40. Tennessee law provides for the enforcement of a contractual choice-of-law provision unless no "reasonable basis" exists for the parties' selection, the jurisdiction whose law is chosen has "no substantial relationship" to the parties, or the application of the chosen jurisdiction's law would be contrary to a "fundamental policy" of a jurisdiction having a "materially greater interest" in the dispute at issue and preclude the application of the interested jurisdiction's law. *Goodwin Brothers Leasing, Inc. v. H&B, Inc.*, 597 S.W.2d 303, 306, n. 2 (Tenn. 1980), quoting the RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(2). The same rule applies in actions governed by Pennsylvania law. *Kruzits v. Okuma Machine Tool, Inc.*, 40 F.3d 52, 55-56 (3d Cir. 1994). Because the contractual choice-of-law provision would be enforced under the substantive law of both Tennessee and Pennsylvania, there is no need for a more nuanced choice-of-law analysis. *Berg Chilling Systems, Inc. v. Hull Corp.*, 435 F.3d 455, 462 (3d Cir. 2006) (explaining that a court "should avoid the choice-of-law question" whenever "the laws of the two [competing] jurisdictions would produce the same result on the particular issue presented").

Dr. Kennedy contends that the contractual choice-of-law provision is ambiguous because it refers to both the law of "the State of Tennessee" and the law of "the United States of America." ECF No. 89 at 3. He posits that "Pennsylvania law quite obviously fits into the latter category." *Id.* This argument is wholly lacking in merit. In the absence of evidence suggesting the contrary, contracting parties are presumed to have drafted the terms of their agreement with reference to existing laws. *Ellis v. Pauline S. Sprouse Residuary Trust*, 280 S.W.3d 806, 814 (Tenn. 2009). The Supremacy Clause of the United States Constitution specifically distinguishes between "the Laws of the United States" and the "Laws of any state," declaring the former to be

13

"the supreme Law of the Land." U.S. CONST., ART. VI. Since "the Judges in every State" are "bound" by federal law regardless of whether that law conflicts with the laws of their respective States, "federal law is as much the law of the several States as are the laws passed by their legislatures." *Haywood v. Drown*, 556 U.S. 729, 734, 129 S.Ct. 2108, 173 L.Ed.2d 920 (2009). In this respect, it would be reasonable to interpret a contractual provision explicitly referring to the law of a particular State to implicitly refer to controlling principles of federal law. *Beard v. Beard*, 618 P.2d 856, 858 (Kan.Ct.App. 1980) (remarking that "contracting parties are presumed to contract with reference to presently existing statutes, ordinances and regulations, the provisions of which will be read into and become a part of the contract by implication").

The converse of that principle intimated by Dr. Kennedy, however, would require the Court to ignore the legal background in which the contract was executed. Any reasonable person familiar with our federal system would understand that "the Laws of the United States" do not include the laws of Pennsylvania. State law cannot be equated with federal law. In *United States v. Belmont*, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937), the Supreme Court explained:

> Within the field of its powers, whatever the United States rightfully undertakes, it necessarily has warrant to consummate. And when judicial authority is invoked in aid of such consummation, state constitutions, state laws, and state policies are irrelevant to the inquiry and decision. It is inconceivable that any of them can be interposed as an obstacle to the effective operation of a federal constitutional power.

*Belmont*, 301 U.S. at 331-332. Since the application of federal law is not circumscribed by the content of state law, the contractual language referencing the law of "the United States of America" cannot be reasonably understood to incorporate the law of Pennsylvania.

The construction of the choice-of-law provision put forth by Dr. Kennedy is flawed for another reason. Even if it was otherwise reasonable to interpret the contract's reference to federal law broadly enough to incorporate Pennsylvania law, Dr. Kennedy's interpretation of the contractual language would render the reference to Tennessee law superfluous. *Pacific Employers Insurance Co. v. Global Reinsurance Corp. of America*, 693 F.3d 417, 428 (3d Cir. 2012). The Pennsylvania courts would not interpret the statement incorporating federal law in such a way as to annul the statement incorporating Tennessee law. *Capek v. Devito*, 767 A.2d 1047, 1050 (Pa. 2001).

The Chattanooga Group's Tennessee facility closed in 2010. ECF Nos. 95 & 98 at ¶¶ 5-6. Encore is a Delaware corporation maintaining its principal place of business in Texas.[7] *Id.* at ¶ 1. The Defendants are all citizens of Pennsylvania. ECF No. 48 at ¶¶ 3-7. In deciding to transfer the case to this Court, the District Court noted that none of the parties to this action were citizens of Tennessee, and that the conduct giving rise to this lawsuit had "largely occurred in Pennsylvania." *Encore*, 861 F.Supp.2d at 895. Dr. Kennedy maintains that these factors weigh in favor of applying Pennsylvania law. ECF No. 89 at 3-4. The fact that this action is being litigated in Pennsylvania, however, does not preclude the application of Tennessee's substantive law. Indeed, a State's law can sometimes be applied to a dispute even if its courts lack jurisdiction over the parties. *Shaffer v. Heitner*, 433 U.S. 186, 215, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977). The Chattanooga Group operated out of Tennessee during the relevant period of time. ECF Nos. 95 & 98 at ¶¶ 5-6. Paul D. Chapman ("Chapman"), Encore's Executive Vice President, signed the contract in Tennessee on July 5, 2002. ECF No. 1-1 at 41; ECF No. 105-27 at 3, ¶ 9. It cannot be doubted that Tennessee's contacts with the parties' dispute are sufficient to

---

[7] For jurisdictional purposes, a corporation is deemed to be a citizen of both its State of incorporation and the State in which it maintains its principal place of business. 28 U.S.C. § 1332(c)(1).

justify the application of its law to their contract. *Phillips Petroleum Co.*, 472 U.S. at 818-819. The District Court presumed that Tennessee law would govern any issues arising out of Dr. Kennedy's alleged breach of the contract, and that this Court would "be able to apply the[] straightforward principles of Tennessee law without great difficulty." *Encore*, 861 F.Supp.2d at 896. Under these circumstances, it is clear that the contract must be construed and applied in accordance with the law of Tennessee.

Tennessee's General Assembly has declared that "[a]ll contracts . . . shall be prima facie evidence that the contract contains the true intention of the parties, and shall be enforced as written . . . ." TENN. CODE ANN. § 47-50-112(a). Consistent with this mandate, the Tennessee courts "do not concern themselves with the wisdom or folly of a contract and will not relieve a party of its contractual obligations simply because the contract later proves to be burdensome or unwise." *Ellis*, 280 S.W.3d at 814 (internal citation omitted). When the language of a contract is "clear and unambiguous," "its literal meaning controls the outcome of a contract dispute, and the court may not look beyond the four corners of the contract to ascertain the parties' intention." *Cummings, Inc. v. Dorgan*, 320 S.W.3d 316, 333 (Tenn.Ct.App. 2009). "[A]llowing a party to introduce evidence of oral statements which contradict the express terms of a written contract defeats the very purpose of committing agreements to writing." *Tidwell v. Morgan Building Systems, Inc.*, 840 S.W.2d 373, 376 (Tenn.Ct.App. 1992). "A contract is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one. A strained construction may not be placed on the language used to find ambiguity where none exists." *Empress Health & Beauty Spa, Inc. v. Turner*, 503 S.W.2d 188, 190-191 (Tenn. 1973). "[W]hen a contractual provision is ambiguous, a court is permitted to use parol evidence, including the contracting parties' conduct and statements regarding the disputed provision, to guide the court

16

in construing and enforcing the contract." *Allstate Insurance Co. v. Watson*, 195 S.W.3d 609, 612 (Tenn. 2006). Only if an ambiguity remains after the application of "established rules of construction" does the meaning of contractual language become a question of fact appropriate for resolution by a jury. *Planters Gin Co. v. Federal Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002).

The meaning of the contractual language is vigorously disputed by the parties. Dr. Kennedy argues that the portion of the contract governing Encore's traction machines expired on June 25, 2006. ECF No. 89 at 11; ECF No. 99 at 2-6. According to Dr. Kennedy, he was free to participate in the "creation, development, manufacture, distribution or sale of any product" that was competitive with the traction machine as of June 25, 2008. ECF No. 99 at 4-5. Encore contends that the contract remained in effect until June 25, 2012, as to both the traction machines and the belting packages. ECF No. 96 at 13-14. Under Encore's interpretation of the contract, Dr. Kennedy is precluded from competing with its traction machines until June 25, 2014. ECF No. 48 at ¶ 88. The Circuit Court agreed with Encore's position and enjoined Dr. Kennedy from engaging in the competitive conduct deemed to be foreclosed by the contract. ECF No. 24-1 at 5-7, 10-11.

After hearing testimonial evidence, the Circuit Court concluded that Dr. Kennedy had been "competing with Encore in violation of the covenant not to compete." ECF No. 24-1 at 5. The applicable language of the contract was deemed to be unambiguous. *Id.* On June 3, 2009, Dr. Kennedy was enjoined from designing, developing, advertising, marketing, or selling products that were competitive with those designed, developed, advertised, marketed, or sold by Encore. *Id.* at 6. Dr. Kennedy later sought an order dissolving the injunction. *Id.* at 10. Although this request was denied on March 3, 2011, the injunction was modified to prohibit Dr.

17

Kennedy from designing, developing, advertising, marketing, or selling only products that were competitive with the traction machines and belting packages described in the agreement. *Id.* The Circuit Court determined that the prohibitions contained in its earlier injunction had been "broader than the prohibitions agreed to by the parties in the contract." *Id.* A few months later, Encore amended its complaint and named Miscoe, Bryanne, Mir-Com and MRP as additional defendants. ECF No. 1 at ¶¶ 2-3. Shortly after the new defendants removed the case to the District Court, Dr. Kennedy filed a motion to vacate the injunction. ECF No. 12. That motion remains pending at the present time. ECF No. 86 at 2.

The "law of the case" doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983). "[T]he doctrine applies as much to the decisions of a coordinate court in the same case as [it does] to a court's own decisions." *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 816, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988). Nonetheless, it "does not limit a federal court's power" to revisit issues already decided. *Public Interest Research Group v. Magnesium Elektron*, 123 F.3d 111, 116 (3d Cir. 1997). Instead, the "law of the case" doctrine merely directs a federal court's "exercise of discretion" in deciding whether to do so. *Id.* The United States Court of Appeals for the Third Circuit has recognized that the availability of new evidence can sometimes justify the "reconsideration of an issue previously resolved in the same case." *Bridge v. United States Parole Commission*, 981 F.2d 97, 103 (3d Cir. 1992). The Court of Appeals has also observed that the doctrine should not be applied if it would cause a party's "right to move for reconsideration" to be "effectively denied." *Hayman Cash Register Co. v. Sarokin*, 669 F.2d 162, 169 (3d Cir. 1982). The Circuit Court's decision concerning the proper interpretation of the

18

contract preceded the addition of Miscoe, Bryanne, Mir-Com and MRP as defendants. Some of the claims asserted against those defendants are dependent upon a finding that Dr. Kennedy breached the "covenant not to compete." ECF No. 48 at ¶¶ 188-218. In order to account for the expansion of the record subsequent to the Circuit Court's decision and provide the additional defendants with an adequate opportunity to defend themselves from Encore's claims, the Court will take a fresh look at Dr. Kennedy's arguments concerning the interpretation of the contract.

The disagreement pertaining to the expiration date can only be understood with reference to the applicable contractual language. The agreement refers to the "traction/decompression belting package" developed by Dr. Kennedy as "the Product" and the "particular traction machine" marketed by Encore as "the Machine." ECF No. 1-1 at 36. Paragraphs #1 and #8 of the agreement provide as follows:

**1. TERM**
The term of this Agreement shall begin on the Effective Date and shall continue for a period of ten years, or until the expiration of the last to expire of any any [sic] U.S. Patent naming KENNEDY as an inventor or co-inventor that may be obtained by ENCORE relating to the Product or any part thereof, whichever is longer. The initial portion of the term of this Agreement, comprising four years unless earlier terminated as hereinafter provided, shall be referred to herein as the Base Term, and the portion of the term of this Agreement after the Base Term shall be referred to herein as the Extended Term.

\*\*\*

**8. COVENANT NOT TO COMPETE**
During the term of this Agreement and for a period of two years from the date of expiration or termination of this Agreement, KENNEDY shall not participate in the creation, development, manufacture, distribution or sale of any product that is competitive with the Machine or the Product in the United States, unless requested or authorized to do so, in writing, by ENCORE.

*Id.* at 36-37, 39. The parties chose June 25, 2002, as the agreement's "Effective Date." *Id.* at 36.

Combining the ten-year "term" of the agreement with the two-year "covenant not to compete,"

Encore maintains that the contract prohibits Dr. Kennedy from competing with its traction machines until June 25, 2014. ECF No. 48 at ¶ 88.

Dr. Kennedy attempts to refute Encore's position by pointing to paragraph #3 of the agreement, which states:

**3.   MARKETING OF THE PRODUCT AND THE MACHINE**

ENCORE shall market the Product and the Machine to customers and potential customers in any market throughout the world. During the Base Term and the Extended Term, ENCORE shall pay to KENNEDY a Base Payment of $18 per unit for each unit of the Product sold. During the Base Term, ENCORE shall also pay to KENNEDY, in addition to the Base Payment, a Supplemental Payment for each unit of the Machine sold with the Product. The Supplemental Payment shall be $400 per unit for the first 100 units of the Machine sold with the Product during each year of the Base Term, and $500 per unit for all units of the Machine sold with the Product in excess of 100 during each year of the Base Term. If sales of the Machine with the Product during any year of the Base Term do not equal at least 100 units, ENCORE shall have the option to terminate the Base Term effective at the end of any such year by giving KENNEDY written notice thereof no later than 30 days after the end of such year.

ECF No. 1-1 at 7. As this language makes clear, Dr. Kennedy was entitled to supplemental payments for units of the traction machine sold only during the Base Term. *Id.* His compensation during the Extended Term was limited to $18.00 for each unit of the belting package sold by Encore. *Id.*

The argument advanced by Dr. Kennedy concerning the duration of the noncompetition covenant does not rest solely on his lack of compensation for sales of Encore's traction machines during the Extended Term. In support of his position, Dr. Kennedy points out that the covenant was to be effective "[d]uring the term of th[e] Agreement and for a period of two years from the date of expiration *or termination* of th[e] Agreement." ECF No. 1-1 at 39 (emphasis added). Paragraph #3 described the circumstances in which Encore was free to "terminate" the Base Term. *Id.* at 37. It was silent as to whether or when Encore could "terminate" either the

20

agreement as a whole or the Extended Term in particular. *Id.* Dr. Kennedy asserts that since the covenant was to become inoperative two years after the agreement's "expiration or termination," it must have been applicable only to the Base Term, which was subject to "termination" under paragraph #3. ECF No. 89 at 12-17. Measuring the duration of the covenant by reference to the Base Term rather than by reference to the agreement as a whole, Dr. Kennedy maintains that he was permitted to engage in conduct competitive with the traction machines as of June 25, 2008. ECF No. 99 at 2-6.

The agreement clearly applies the "covenant not to compete" to both "the Machine" and "the Product." ECF No. 1-1 at 39. Dr. Kennedy does not dispute that general proposition. He concedes that the covenant remains operative as to "the Product" through June 25, 2014, since the Extended Term did not expire until June 25, 2012. ECF No. 89 at 11. Nevertheless, Dr. Kennedy insists that the covenant was operative as to "the Machine" only through June 25, 2008, since the Base Term expired on June 25, 2006. *Id.* In other words, he understands "the term of this Agreement," as used in paragraph #8, to refer to the Base Term as to "the Machine" and to the Extended Term as to "the Product." ECF No. 1-1 at 39. He maintains that Encore's interpretation of the contractual language would render the word "termination" superfluous, since only the Base Term was subject to "termination" under paragraphs #1 and #3. ECF No. 99 at 3-5. This argument is not without force, since "[a]ll provisions of a contract should be construed in harmony with each other so as to give effect to each provision." *Cummings, Inc.*, 320 S.W.3d at 333.

In determining whether contractual language is ambiguous, a court must interpret that language within the context of the contract as a whole. *Adkins v. Bluegrass Estates, Inc.*, 360 S.W.3d 404, 412-413 (Tenn.Ct.App. 2011). Paragraph #13, which governs amendments and

21

modifications, provides that the agreement "may not be released, discharged, abandoned or modified in any manner" other than by a "written instrument" executed by Dr. Kennedy and an authorized representative of Encore. ECF No. 1-1 at 39. That portion of the agreement says nothing about "termination." The contract is silent as to how "th[e] Agreement" as a whole could be "terminat[ed]" within the meaning of paragraph #8. *Id.* The only references to "termination" contained in the contract are those which concern Encore's "option to terminate the Base Term." *Id.* at 36-37. The fact that paragraph #8 contemplates a scenario in which "termination" could trigger the beginning of the two-year noncompetition period lends credence to Dr. Kennedy's position that the prohibition's duration as to "the Machine" should be measured from the "expiration *or termination*" of the Base Term. *Id.* at 39 (emphasis added). It is worth noting that the portion of the contract defining "[t]he term of this Agreement" specifically referred to Encore's right to terminate the Base Term. *Id.* at 36-37.

Because the applicable contractual language "is of uncertain meaning and may fairly be understood in more ways than one," it is ambiguous. *Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975). In light of this ambiguity, extrinsic evidence may be considered in order to ascertain the proper interpretation of the contractual language. *Cummings, Inc.*, 320 S.W.3d at 333. Such evidence may include "the construction placed on the contract by the parties in carrying out its terms." *Simonton v. Huff*, 60 S.W.3d 820, 825 (Tenn.Ct.App. 2000).

It is undisputed that the Base Term expired on June 25, 2006. ECF No. 1-1 at 36-37. In a memorandum to the Chattanooga Group's "specialty dealers" dated June 29, 2006, Peetros responded to some "frequently asked questions" that had been posed to him during the second quarter of 2006. ECF No. 93-2 at 9-11. The relevant portion of the memorandum stated as follows:

### Is Dr. Kennedy still associated with the Chattanooga Group?

Dr. Kennedy's contract with us has expired and we have decided not to renew it. Chattanooga Group rarely extends contracts with consultants beyond our initial agreements. We will still have contact with Dr. Kennedy since we produce the QuickWrap belts, a product that we mutually hold rights to. Dr. Kennedy has been a major contributor to the success of DTS, and will have my respect for years to come. I consider him a friend and a brilliant practitioner.

*Id.* at 11 (boldface type in original). Donna Craft ("Craft"), an Administrative Specialist employed by the Chattanooga Group's Specialty Products Division, emailed Peetros' memorandum to several dealers on the afternoon of June 30, 2006. *Id.* at 8. Lori Miscoe was included in Craft's list of recipients. *Id.*

When asked about his memorandum during the course of a subsequent deposition, Peetros testified that he had "used the wrong wording" while drafting his response to the question concerning Dr. Kennedy's association with the Chattanooga Group. ECF No. 105-17 at 8. He explained that his statements had been meant to convey that the Chattanooga Group was no longer employing Dr. Kennedy to provide educational seminars on Encore's behalf.[8] *Id.* Dr. Kennedy testified that his "contract" with the Chattanooga Group had "expired" on June 25, 2006. ECF No. 90-1 at 27.

Under Tennessee law, the parties to a contract containing a "restrictive clause" are free to terminate its operation. *Arkansas Dailies, Inc. v. Dan*, 260 S.W.2d 200, 202-204 (Tenn.Ct.App. 1953). Encore argues that Peetros' memorandum did not constitute a "termination" of the contract. ECF No. 101 at 26. The contract specified that the agreement could not be "released, discharged, abandoned or modified" without the execution of a "written instrument" signed by

---

[8] On June 25, 2002, Dr. Kennedy and Encore executed a separate agreement governing the provision of educational seminars. ECF No. 93-1 at 61-67. The terms of that agreement are not disputed in this case. Peetros responded in the negative when asked whether his reference to the expiration of Dr. Kennedy's contract with Encore had concerned the agreement relating to seminars. ECF No. 105-17 at 5-19. Instead of clarifying the statements contained in his memorandum of June 29, 2006, Peetros appeared to back away from them. *Id.*

23

Dr. Kennedy and a "duly authorized representative" of Encore. ECF No. 1-1 at 39. In an affidavit signed on June 13, 2012, Peetros declared that he had no authority to "terminate" the agreement, and that none of his superiors had advised him of such a "termination." ECF No. 105-19 at 8, ¶ 24.

The problem with Encore's assertion concerning Peetros' memorandum is that it responds to an argument that Dr. Kennedy does not make. Dr. Kennedy does not maintain that Peetros "terminated" the agreement when he released his memorandum to Encore's dealers. ECF No. 107 at 2-3. Instead, Dr. Kennedy posits that Encore's "option to terminate [only] the Base Term," the measurement of the noncompetition covenant from the "expiration or termination" of the agreement, and the statement in Peetros' memorandum concerning the "expiration" of the contract suggest that the covenant was understood by the parties to be operative as to "the Machine" only through June 25, 2008. *Id.*; ECF No. 1-1 at 36-37, 39; ECF No. 93-2 at 9-11. The position taken by Dr. Kennedy is that the portion of the agreement governing the traction machines "expired" on June 25, 2006. ECF No. 107 at 2-3. He relies on the word "termination" solely to explain why the applicable contractual language could reasonably be construed to mean that the noncompetition covenant as to "the Machine" was to be measured by reference to the Base Term rather than by reference to the Extended Term. *Id.*

Although noncompetition agreements are disfavored under Tennessee law, they will be enforced if they are deemed to be reasonable under the particular circumstances presented. *Columbus Medical Services, L.L.C. v. David Thomas & Liberty Healthcare Corp.*, 308 S.W.3d 368, 383-384 (Tenn. Ct. App. 2009). "Reasonableness is determined by a case-by-case analysis of the particular facts." *Amerigas Propane, Inc. v. Crook*, 844 F.Supp. 379, 385 (M.D. Tenn. 1993). In determining whether a noncompetition covenant is sufficiently "reasonable" to be

24

enforceable, the Tennessee courts consider the consideration supporting the agreement, the threatened danger to the protected party in the absence of the restriction, the economic hardship imposed on the restricted party, and the compatibility of the restriction with the public interest. *Allright Auto Parks, Inc. v. Berry*, 409 S.W.2d 361, 363 (Tenn. 1966). In order to be valid, "the covenant in restraint of trade must be reasonable as to time and space." *Delta Corp. of America v. Sebrite Corp.*, 391 F.Supp. 638, 641 (E.D.Tenn. 1974).

Without directly challenging the enforceability of the noncompetition covenant, Dr. Kennedy maintains that no reasonable person would have signed the agreement if it were to be interpreted in the manner presently proposed by Encore. ECF No. 89 at 17. The geographic reach of the covenant extends to the entire United States. ECF No. 1-1 at 39. In the event that less than 100 units of the traction machine were sold, Encore had the option of terminating the Base Term after only one year. *Id.* at 37. Under Encore's interpretation of the contractual language, Dr. Kennedy would have remained subject to the provision prohibiting competitive conduct through June 25, 2014, even if the Base Term had been terminated on June 25, 2003. *Id.* at 36-37, 39. As Dr. Kennedy points out, the applicable period would have been extended even further if Encore had obtained a patent naming him as "an inventor or co-inventor" of the belting package. *Id.* at 36; ECF No. 89 at 17. He suggests that the "manifestly unreasonable" nature of the terms embodied within Encore's interpretation of the contract counsels against a decision adopting that interpretation. ECF No. 89 at 17.

It is worth noting that, under the contract, Dr. Kennedy was entitled to receive $18.00 for each unit of the belting package sold by Encore through June 25, 2012. ECF No. 1-1 at 37. Encore did not have the option of terminating that entitlement. *Id.* Dr. Kennedy's continuing receipt of royalties for sales of the belting package could arguably constitute adequate

consideration for the portion of the noncompetition covenant governing sales of the traction machine, even if that portion of the covenant is read as broadly as Encore proposes. *Central Adjustment Bureau, Inc. v. Ingram*, 678 S.W.2d 28, 35 (Tenn. 1984). The issue presently before the Court, however, is not whether Encore's reading of the covenant would render it unenforceable under Tennessee law. Instead, the relevant question is whether that interpretation is consistent with "the intent of the contracting parties" at the time of the agreement's execution. *Planters Gin Co.*, 78 S.W.3d at 890. Given that the contract, as construed by Encore, would have precluded Dr. Kennedy from competing with sales of the traction machine for twelve or more years even if the Base Term had been terminated after only one year, a reasonable trier of fact could conclude that the parties' true intent was to measure the portion of the covenant prohibiting competition with the traction machine by reference to the Base Term.

Dr. Kennedy argues that he is entitled to summary judgment with respect to the meaning of the contract. ECF No. 89 at 17. Nevertheless, the Court cannot conclude as a matter of law that the interpretation put forth by Dr. Kennedy at this time necessarily reflects the understanding of the parties at the time of the contract's execution. The contractual language could reasonably be read to measure the noncompetition covenant by reference to "the term of th[e] Agreement" as a whole rather than by reference to the "initial portion" of that term. ECF No. 1-1 at 36, 39. That is how the Circuit Court construed the agreement.[9] ECF No. 24-1 at 5. "[S]ummary judgment is inappropriate when the terms of a contract are ambiguous and the evidence reveals a genuine controversy as to the true meaning of the contract." *United States v. Tennessee*, 632 F.Supp.2d 795, 801 (W.D.Tenn. 2009). Dr. Kennedy's motion for summary judgment will be

---

[9] Even in the absence of ambiguous language, a court charged with the duty of interpreting a contract "may consider the situation of the parties, the business to which the contract relates, the subject matter of the contract, the circumstances surrounding the transaction, and the construction placed on the contract by the parties in carrying out its terms." *Simonton v. Huff*, 60 S.W.3d 820, 825 (Tenn. Ct. App. 2000). It is not clear whether the Circuit Court was aware of Peetros' memorandum of June 29, 2006, when the injunction was entered. ECF No. 93-2 at 8-11.

denied with respect to Encore's breach-of-contract claims.[10]  ECF No. 88 at ¶¶ 1(a)-(b), 4-5. Encore's motion for partial summary judgment will also be denied. ECF No. 94.

## B.    The Motion to Vacate

Paragraph #11 of the agreement provides that a breach thereof by Dr. Kennedy would cause "irreparable injury" to Encore, and that Encore "shall be entitled to injunctive and other equitable relief or damages, in addition to any other rights and remedies available to it," "in the event of any such breach." ECF No. 1-1 at 39.  Interpreting the noncompetition covenant to prohibit Dr. Kennedy from competing with both the belting packages and the traction machines through June 25, 2014, the Circuit Court enjoined him from designing, developing, advertising, marketing, or selling products that were competitive with those items. ECF No. 24-1 at 2-7, 9-11.  When Encore sought leave to amend its complaint, the Circuit Court expressed concern that "the delay necessitated by adding new parties would be unduly prejudicial to Dr. Kennedy." ECF No. 24-1 at 14.  The Circuit Court nevertheless decided to leave the injunction in place pending the resolution of the case, since it required only that Dr. Kennedy honor his contractual obligations to Encore.  *Id.*  Shortly after the case was removed to the District Court, Dr. Kennedy filed a motion to vacate the injunction. ECF No. 12.  That motion remains pending at the present time. ECF No. 86 at 2.

Pursuant to 28 U.S.C. § 1450, the Circuit Court's injunction "remain[s] in full force and effect until dissolved or modified" by this Court.  This statutory provision ensures that orders entered by a state court prior to removal retain their "binding effect" unless or until "they are actively dissolved or modified" by a federal court.  *Killmeyer v. Oglebay Norton Co.*, 817 F.Supp.2d 681, 687 (W.D.Pa. 2011).  Section 1450 "promote[s] judicial economy by making it

---

[10] To the extent that Dr. Kennedy's earlier motion for summary judgment was not subsumed by his subsequent motion for summary judgment, it will also be denied. ECF No. 10.

unnecessary in many cases to duplicate in federal court pleadings previously filed in state court." *Tehan v. Disability Management Services, Inc.*, 111 F.Supp.2d 542, 547 (D.N.J. 2000). By acknowledging the possibility of dissolution or modification, § 1450 recognizes a federal court's "authority to dissolve or modify injunctions, orders, and all other proceedings had in state court prior to removal." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers, Local No. 70*, 415 U.S. 423, 437 (1974). "The Federal Rules of Civil Procedure, like other provisions of federal law, govern the mode of proceedings in federal court after removal." *Id.* at 438. The governing law "mandates no predetermined level of deference which a federal court must observe in reconsidering an interlocutory state court order." *Nissho-Iwai American Corp. v. Kline*, 845 F.2d 1300, 1303 (5th Cir. 1988).

Federal Rule of Civil Procedure 65(d)(1)(C) requires "[e]very order granting an injunction" to "describe in reasonable detail . . . the act or acts restrained or required." FED. R. CIV. P. 65(d)(1)(C). "Modification of an injunction is proper only when there has been a change of circumstances between [the] entry of the injunction and the filing of [a] motion [challenging its continuation] that would render the continuance of the injunction in its original form inequitable." *Favia v. Indiana University of Pennsylvania*, 7 F.3d 332, 337 (3d Cir. 1993). "The need for changed circumstances prevents an enjoined party from constantly challenging the imposition of a preliminary injunction and relitigating arguments on motions to dissolve that have already been considered by the [issuing] court in its initial decision." *Sprint Communications Co., L.P. v. CAT Communications International, Inc.*, 335 F.3d 235, 242 (3d Cir. 2003).

Although federal law governs the standard for issuing an injunction, the question of whether a state cause of action can support injunctive relief is governed by state law. *John Paul*

28

*Mitchell Systems v. Quality King Distributors, Inc.*, 106 F.Supp. 2d 462, 477-478 (S.D.N.Y. 2000). Under Tennessee law, a court can enjoin actual *violations* of a noncompetition covenant. *Kaset v. Combs*, 434 S.W.2d 838, 841 (Tenn. Ct. App. 1968). The injunction entered by the Circuit Court was initially predicated on a finding that Dr. Kennedy had been "competing with Encore in violation of the covenant not to compete." ECF No. 24-1 at 5. It was later modified to prohibit only competitive conduct that was specifically precluded by the terms of the contract. *Id.* at 10. As the District Court recognized in transferring this case, however, the parties were essentially required to "restart" this litigation when Encore decided to name four additional defendants. *Encore*, 861 F.Supp. 2d at 897. Having reviewed the contractual language and evidentiary record, this Court is convinced that a trier of fact "must ascertain the intended meaning of the terms used" in the agreement. *Bonastia v. Berman Bros., Inc.*, 914 F.Supp. 1533, 1536-1537 (W.D. Tenn. 1995). In light of this determination, the predicate for the injunction is no longer present.

Dr. Kennedy concedes that, with respect to the belting package, the noncompetition covenant prevents him from engaging in competitive conduct through June 25, 2014. ECF No. 89 at 11. Consequently, the portion of the injunction enjoining conduct competitive with the belting package will not be disturbed. Nonetheless, the injunction will be modified to exclude restrictions relating to conduct that is competitive with the traction machine, since a genuine issue of material fact exists as to whether the relevant portion of the covenant has already expired. ECF No. 24-1 at 10. In the event that the trier of fact determines that the covenant precludes conduct competitive with the traction machine through June 25, 2014, Encore remains free to seek further relief under paragraph #11 of the agreement. ECF No. 1-1 at 39. In the meantime, Dr. Kennedy's motion to vacate will be granted in part, and the injunction will be

modified to restrain only conduct that is clearly violative of his contract with Encore. ECF No. 12.

## C. The Alleged Appropriation of Encore's "Property"

Bryanne became an Encore dealer in 2001 or 2002. ECF Nos. 95 & 98 at ¶ 42. In that capacity, Bryanne distributed Encore's products throughout the western part of Pennsylvania. *Id.* In a letter dated September 22, 2008, Dwayne Hofstatter ("Hofstatter"), Encore's Senior Vice President for Domestic Sales & Marketing, informed Miscoe that Encore would be terminating its "distributor relationship" with Bryanne on November 26, 2008. ECF No. 93-2 at 13. David J. Weaver ("Weaver"), Bryanne's attorney, apparently responded to Hofstatter's correspondence by inquiring as to why Encore had decided to take that action. Donald M. Roberts ("Roberts"), the General Counsel for the Chattanooga Group, responded with a letter to Weaver dated October 6, 2008. *Id.* at 15. In his letter, Roberts insisted that the Chattanooga Group had been "well within its rights in terminating the distributor relationship with Bryanne," and that Encore personnel saw "no point in engaging in a discussion" with Miscoe about the reasons for the termination. *Id.* Roberts concluded his letter by stating as follows:

> Your client is free to engage with other vendors or other product lines, just as the Company is free to adjust its distribution resources to fit its needs. We appreciate the opportunity to have done business with your client over the past several years and wish Mr. Miscoe well in the future.

*Id.* During the spring of 2009, Bryanne started to market and sell the "Kennedy Decompression Table." ECF Nos. 95 & 98 at ¶ 46.

At some point, Mir-Com started to market and sell Kennedy Decompression Tables, "SlipStop Traction Blocks," and seminars taught by Dr. Kennedy. *Id.* at ¶ 50. Mir-Com pays Dr. Kennedy $11.00 for each unit of SlipStop Traction Blocks that it sells. *Id.* at ¶ 51. Dr.

30

Kennedy receives $1,500.00 per month to teach seminars on behalf of Mir-Com. *Id.* at ¶ 51.

MRP produces videos of Dr. Kennedy's seminars. *Id.* at ¶¶ 56, 59, 168.

Paragraph #4 of the agreement executed by Encore and Dr. Kennedy provides as follows:

### 4.     OWNERSHIP OF NEW DEVELOPMENTS

KENNEDY agrees that any and all inventions, improvements, trade secrets and know-how relating to traction machines (including, but not limited to the Machine) and accessories for traction machines (including, but not limited to the Product) that are conceived, made or developed by him during the Base Term, including modifications of and improvements to the Product, shall belong exclusively to ENCORE. KENNEDY agrees to disclose any such inventions, improvement, trade secrets and know-how to ENCORE promptly upon creation. Upon request, KENNEDY shall execute all documents and do all things necessary or desirable in order to perfect ENCORE's title thereto.

ECF No. 1-1 at 37. When this case was still pending in Tennessee, the Circuit Court concluded that "genuine issues of material fact" existed as to "[w]hether certain products were invented or developed during the term of the contract between the parties." ECF No. 24-1 at 9. A trial was scheduled to begin on June 28, 2011. *Id.* at 14. The scheduled trial was ultimately cancelled so that Encore could add claims against Miscoe, Bryanne, Mir-Com and MRP. *Id.*

Although the primary basis for Encore's breach-of-contract claim rests on the noncompetition covenant, it appears that Encore is partially basing that claim on alleged breaches of paragraph #4. ECF No. 48 at ¶¶ 80-82. The existing record supports the Circuit Court's conclusion that genuine issues of material fact exist as to whether that portion of the agreement has been breached. ECF No. 24-1 at 9. Therefore, Encore will be free to argue at trial that products currently promoted by Dr. Kennedy on behalf of Encore's competitors were "conceived, made or developed by him during the Base Term." ECF No. 1-1 at 37.

In Count VI of the second amended complaint, Encore asserts claims for conversion against all five defendants. ECF No. 48 at ¶¶ 199-203. These claims are premised on the idea

31

that the Defendants unlawfully converted property "belong[ing] exclusively" to Encore. ECF No. 1-1 at 37. Under the present circumstances, however, Encore's "conversion" claims are not cognizable. Neither Tennessee nor Pennsylvania recognizes claims for the conversion of intangible "property." *Ralph v. Pipkin*, 183 S.W.3d 362, 368 (Tenn. Ct. App. 2005); *Pestco, Inc. v. Associated Products, Inc.*, 880 A.2d 700, 708 (Pa. Super. Ct. 2005); *Northcraft v. Edward C. Michener Associates, Inc.*, 466 A.2d 620, 628 (Pa. Super. Ct. 1983). Encore does not allege that the Defendants have wrongfully appropriated a tangible form of property, such as a physical piece of equipment in its possession. ECF No. 48 at ¶¶ 199-203. Consequently, the Defendants' motions for summary judgment will be granted with respect to Encore's "conversion" claims. ECF No. 88 at ¶ 1(f); ECF No. 91 at ¶ 2.

In Count VIII, Encore asserts "unjust enrichment" claims against the Defendants. ECF No. 48 at ¶¶ 211-218. Like the "conversion" claims, Encore's "unjust enrichment" claims appear to be based on the alleged appropriation of its "property." *Id.* at 212-218. In both Tennessee and Pennsylvania, an unjust enrichment claim requires a showing that the plaintiff conferred a benefit upon the defendant, that the defendant was aware of the benefit, and that the defendant's acceptance of the benefit occurred under circumstances in which "it would be inequitable for him [or her] to retain the benefit without payment of the value thereof." *Fabral, Inc. v. B&B Roofing Co., Inc.*, 773 F.Supp. 2d 539, 549, n. 10 (E.D. Pa. 2011) (referring to the applicable rules of law in both Tennessee and Pennsylvania). "[T]he doctrine of unjust enrichment is inapplicable when the relationship between parties is founded upon a written agreement or express contract." *Wilson Area School District v. Skepton*, 895 A.2d 1250, 1254 (Pa. 2006). Although "[a] plaintiff need not be in privity with a defendant to recover under a claim of unjust enrichment," he or she must "exhaust[] all remedies" against the defendant

32

before proceeding on a theory of unjust enrichment. *Freeman Industries, L.L.C. v. Eastman Chemical Co.*, 172 S.W.3d 512, 525 (Tenn. 2005).

Encore's "unjust enrichment" claims are clearly rooted in alleged breaches of the contract itself. The breach-of-contract claims asserted against Dr. Kennedy fairly encompass the alleged appropriation of Encore's "property." ECF No. 48 at ¶¶ 80-82. Encore asserts separate claims against Miscoe, Bryanne, Mir-Com and MRP for inducing Dr. Kennedy's alleged breaches of the contract. *Id.* at ¶¶ 188-198. These issues should be "assessed according to the well-established rules defining the applicable torts[] rather than by free-floating notions of 'equity and good conscience.'" *Astor Holdings, Inc. v. Roski*, Civil Action No. 01-1905, 2002 WL 72936, at *18, 2002 U.S. Dist. LEXIS 758, at *56 (S.D.N.Y. Jan. 17, 2002). The Defendants' motions for summary judgment will be granted with respect to Encore's "unjust enrichment" claims. ECF No. 88 at ¶ 1(h); ECF No. 91 at ¶ 4.

## D.    Miscoe's Alleged Interference with Dr. Kennedy's Contractual Obligations

In Count V of the second amended complaint, Encore purports to assert claims against Miscoe, Bryanne, Mir-Com and MRP for "procuring" Dr. Kennedy's alleged "breach" of the contract. ECF No. 48 at ¶¶ 188-198. In support of these claims, Encore alleges that Miscoe "acted willfully, maliciously, and without justification to procure" Dr. Kennedy's breach of his obligations under the agreement. *Id.* at ¶ 193. It is further alleged that Miscoe's conduct "proximately caused" the alleged breach giving rise to Encore's distinct claims against Dr. Kennedy. *Id.* at ¶ 195. Miscoe, Bryanne, Mir-Com and MRP move for summary judgment with respect to Encore's "procurement" claims. ECF No. 91 at ¶ 1.

Before addressing the merits of those claims, the Court must determine whether they are governed by Tennessee or Pennsylvania law. As discussed earlier, an actual conflict between the

33

laws of the interested jurisdictions is a "necessary predicate" to a more detailed choice-of-law analysis. *Hataway*, 830 S.W.2d at 57. Encore maintains that no conflict exists between the laws of the interested jurisdictions with respect to its "procurement" claims, thereby requiring the application of Tennessee law by default. ECF No. 102 at 10-11. Miscoe, Bryanne, Mir-Com and MRP contend that pertinent differences exist between Tennessee law and Pennsylvania law, and that Tennessee's choice-of-law rules mandate the application of Pennsylvania's substantive law under the present circumstances. ECF No. 108 at 5-8.

Tennessee recognizes both common law and statutory causes of action for the "unlawful inducement of a breach of contract." *Quality Auto Parts Co., Inc. v. Bluff City Buick Co., Inc.*, 876 S.W.2d 818, 822 (Tenn. 1994). In order to establish a cause of action under this theory, a plaintiff must demonstrate that: (1) a contract existed between the plaintiff and a third party; (2) the defendant had knowledge of the contract; (3) the defendant intended to cause or bring about a breach of the contract; (4) the defendant acted maliciously; (5) the third party breached the contract; (6) the defendant's conduct was the proximate cause of the breach; and (7) the breach caused the plaintiff to suffer damages. *Hauck Manufacturing Co. v. Astec Industries, Inc.*, 376 F.Supp.2d 808, 832 (E.D.Tenn. 2005). The statutory cause of action is based on TENN. CODE ANN. § 47-50-109, which provides:

**47-50-109. Procurement of breach of contracts unlawful—Damages.**
It is unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto; and, in every case where a breach or violation of such contract is so procured, the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of the contract. The party injured by such breach may bring suit for the breach and for such damages.

34

TENN. CODE ANN. § 47-50-109. The Tennessee Supreme Court has described § 47-50-109 as "a statutory declaration of the common law tort action, expressly substituting treble damages for punitive damages." *Polk & Sullivan, Inc. v. United Cities Gas Co.*, 783 S.W.2d 538, 542 (Tenn. 1989). The elements necessary to establish a common law claim are identical to those necessary to establish a statutory claim. *Givens v. Mullikin*, 75 S.W.3d 383, 405 (Tenn. 2002). The only difference between the two causes of action is that a plaintiff proceeding with a common law claim can recover punitive damages, whereas a plaintiff proceeding directly under the statute can recover treble damages. *Id.* Where a plaintiff successfully asserts claims for both punitive damages and treble damages, he or she must choose one remedy over the other. *Buddy Lee Attractions, Inc. v. William Morris Agency, Inc.*, 13 S.W.3d 343, 355-358 (Tenn. Ct. App. 1999).

Pennsylvania recognizes "an action in tort for an intentional, unprivileged interference with contractual relations." *Birl v. Philadelphia Electric Co.*, 167 A.2d 472, 474 (Pa. 1960). To sustain a cause of action for "intentional interference with business relations" under Pennsylvania law, a plaintiff must demonstrate that: (1) there was an existing contractual relationship between the plaintiff and a third party; (2) the defendant induced the plaintiff to breach his or her contractual obligations; (3) the defendant's conduct was not privileged; and (4) the breach caused the plaintiff to suffer pecuniary loss. *Al Hamilton Contracting Co. v. Cowder*, 644 A.2d 188, 191 (Pa. Super. Ct. 1994). "The second element requires proof that the defendant acted 'for the specific purpose of causing harm to the plaintiff.'" *Phillips v. Selig*, 959 A.2d 420, 429 (Pa.Super.Ct. 2008), quoting *Glenn v. Point Park College*, 272 A.2d 895, 899 (Pa. 1971). "The third element requires proof that the defendant's actions were *improper* under the circumstances presented." *Walnut Street Associates, Inc. v. Brokerage Concepts, Inc.*, 982 A.2d 94, 98 (Pa. Super. Ct. 2009) (emphasis in original). In determining whether an actor's conduct is

35

"improper," a court must consider: "(a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the others with which the actor's conduct interferes; (d) the interests sought to be advanced by the actor; (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (f) the proximity or remoteness of the actor's conduct to the interference; and (g) the relations between the parties." *Id.*, quoting the RESTATEMENT (SECOND) OF TORTS § 767. A plaintiff who maintains a successful claim under this theory may be entitled to an award of punitive damages. *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 500 F.Supp. 1312, 1322 (W.D. Pa. 1980).

There are two primary differences between the law of Tennessee and the law of Pennsylvania relating to the procurement of a breach of another's contractual obligations. Pennsylvania law requires a plaintiff to establish, as a part of his or her *prima facie* case, that "the defendant's conduct was not justified." *Triffin v. Janssen*, 626 A.2d 571, 574, n. 3 (Pa. Super. Ct. 1993). In contrast, Tennessee law appears to treat justification as an affirmative defense. *Edwards v. Travelers Insurance of Hartford*, 563 F.2d 105, 121 (6th Cir. 1977) ("Inducement to breach a contract will not be wrongful if *the person interfering* can show a justification and privilege for such interference.") (emphasis added). A plaintiff proceeding under Pennsylvania law can recover punitive damages. *Mellon Bank, N.A.*, 500 F.Supp. at 1322. Under Tennessee law, a plaintiff can elect to recover either the punitive damages available under the common law or the treble damages available under § 47-50-109. *Buddy Lee Attractions, Inc.*, 13 S.W.3d at 355-358. In the second amended complaint, Encore asserts an entitlement to both treble damages and punitive damages. ECF No. 48 at ¶¶ 197-198.

Since the instant action was transferred from the Eastern District of Tennessee, the Court must look to Tennessee's choice-of-law rules in order to determine whether Encore's

"procurement" claims against Miscoe, Bryanne, Mir-Com and MRP are governed by Tennessee or Pennsylvania law. *Amica Mutual Life Insurance Co.*, 656 F.3d at 171. Tennessee follows the "most significant relationship" test described in § 145 of the RESTATEMENT (SECOND) OF CONFLICT OF LAWS. *Montgomery v. Wyeth*, 580 F.3d 455, 459 (6th Cir. 2009). Under that test, the "contacts" underpinning the analysis include "the place where the [plaintiff's] injury occurred," "the place where the conduct causing the injury occurred," "the domicile[s], residence[s], nationalit[ies], place[s] of incorporation and place[s] of business of the parties," and "the place where the relationship, if any, between the parties is centered." *Id.* at 459-460.

Encore and Dr. Kennedy agreed that Tennessee law would govern the terms of their contract. ECF No. 1-1 at 40. Miscoe, Bryanne, Mir-Com and MRP were never parties to that agreement. As the District Court observed in deciding to transfer the case to this Court, "the locus of operative facts in this action is firmly rooted in Pennsylvania." *Encore*, 861 F.Supp. 2d at 896. All five defendants reside in Pennsylvania. ECF No. 48 at ¶¶ 3-7. Although the Chattanooga Group operated out of Tennessee during the relevant period of time, Encore is a Delaware corporation maintaining its principal place of business in Texas. *Id.* at ¶ 1. No party to this action is a citizen of Tennessee. The conduct of Miscoe alleged to have been tortious "largely occurred in Pennsylvania." *Encore*, 861 F.Supp. 2d at 895. Under these circumstances, Tennessee's choice-of-law rules warrant the application of Pennsylvania's substantive law to Encore's "procurement" claims. *Hataway*, 830 S.W.2d at 60.

The Court has already concluded that a genuine issue of material fact exists as to whether Dr. Kennedy's noncompetition covenant with Encore remains operative through June 25, 2014. Peetros testified that the language contained in the agreement had been drafted and approved by Encore's attorneys. ECF No. 90-1 at 11. In an affidavit signed on June 7, 2012, Miscoe

37

declared that he had not been aware of the terms of Dr. Kennedy's contract with Encore prior to the commencement of this action. ECF No. 98-3 at ¶ 7. That assertion, however, is contradicted by other evidence found in the record. During the hearing conducted before the Circuit Court, Dr. Kennedy testified that he had discussed the terms of the agreement with Miscoe prior to the date of its execution. ECF No. 97-5 at 22. In an affidavit signed on June 13, 2012, Peetros stated that he and Miscoe had talked about the contract "almost daily" during the period of time in which it was being negotiated. ECF No. 105-19 at ¶ 7. An email sent from Peetros to Miscoe on October 18, 2007, warned that there were "some contractual issues" that Dr. Kennedy would "have to deal with" if he were to "promote a competitive product." ECF No. 105-26 at 2. Because Miscoe and his companies are the parties moving for summary judgment, the conflicting evidence must be viewed in the light most favorable to Encore. *Thompson v. Wagner*, 631 F.Supp. 2d 664, 678 (W.D. Pa. 2008).

The Pennsylvania courts generally follow the RESTATEMENT (SECOND) OF TORTS in determining the contours of a "tortious interference with contractual relations" claim. *Walnut Street Associates, Inc. v. Brokerage Concepts, Inc.*, 20 A.3d 468, 469-479 (Pa. 2011). Section 769 of the RESTATEMENT states that "[o]ne who, having a financial interest in the business of a third person intentionally causes that person not to enter into a *prospective* contractual relation with another, does not interfere improperly with the other's relation if he (a) does not employ wrongful means and (b) acts to protect his interest from being prejudiced by the relation." RESTATEMENT (SECOND) OF TORTS § 769 (emphasis added). Miscoe argues that Bryanne's status as an Encore distributor gave him a "financial interest" in Encore's welfare, thereby rendering the success of Encore's claims a "legal impossibility" under § 769. ECF No. 92 at 9-11. The problem with this argument is apparent from the language of the RESTATEMENT relied

upon by Miscoe. Encore's claims are based on inducements to breach an *existing* contract rather than on inducements to decline a *prospective* offer. ECF No. 48 at ¶¶ 188-198.

Peetros' memorandum of June 29, 2006, which referred to the "expiration" of Encore's contract with Dr. Kennedy, was emailed to Miscoe's wife. ECF No. 93-2 at 8-11. Miscoe contends that Encore's representation concerning the "expiration" of the agreement precludes a determination that he intended to induce a contractual breach during the period of time postdating the memorandum. ECF No. 92 at 10. The Court understands this argument to be based on the idea that even if Dr. Kennedy breached the contract, Miscoe could not have recognized his "competitive" conduct as an inducement to breach because of his "reasonable belief" that the contract had "expired." *Id.*

Although Miscoe's assertion may prove to be convincing to a trier of fact, it does not entitle him and his companies to summary judgment on the basis of the existing record. Encore points to evidence which suggests that Miscoe was familiar with the terms of the agreement. ECF No. 97-5 at 22-23; ECF No. 105-19 at ¶ 7; ECF No. 105-26 at 2. Even under Dr. Kennedy's interpretation of the agreement, he was contractually precluded from competing with sales of the traction machines through June 25, 2008. ECF No. 1-1 at 39. Peetros stated in his affidavit that Miscoe had started to develop his own decompression table as early as October 2007. ECF No. 105-19 at ¶ 10. On October 18, 2007, Peetros sent Miscoe an email suggesting that Dr. Kennedy's contractual obligations to Encore would complicate his ability to "promote a competitive product." ECF No. 105-26 at 2.

During the hearing conducted before the Circuit Court, Dr. Kennedy testified that Miscoe had participated in the designing of the tables that were being manufactured by Armedica. ECF No. 105-2 at 14-15. He stated that Mir-Com had contracted with Armedia to facilitate the

manufacture of the tables. *Id.* According to Dr. Kennedy, the tables had been based on "design drawings" that he had created in his office "over the years." *Id.* Under the contract, however, Encore acquired the right to "any and all inventions, improvements, trade secrets and know-how relating to traction machines . . . conceived, made or developed by [Dr. Kennedy] during the Base Term." ECF No. 1-1 at 37. Some of Dr. Kennedy's "drawings" were faxed to Peetros when the terms of the contract were being negotiated. ECF No. 97-1 at ¶¶ 33-40. As explained earlier, there are genuine issues of material fact as to "[w]hether certain products were invented or developed" during the Base Term, and as to whether those products are "in competition with" the traction machines and belting packages governed by the contract.[11] ECF No. 24-1 at 9. Since a reasonable trier of fact could conclude that Miscoe was aware of the terms of the contract and nevertheless sought Dr. Kennedy's assistance in marketing products in competition with the traction machines and belting packages advertised by Encore, summary judgment is inappropriate.

In order to proceed with its "procurement" claims, Encore must demonstrate that it suffered damages as a result of Miscoe's conduct. *Small v. Juniata College*, 682 A.2d 350, 354 (Pa. Super. Ct. 1996). In an affidavit signed on May 14, 2012, Peetros declared that two Encore dealers had lost a sale to the competing "Kennedy Decompression Table" on June 11, 2009. ECF No. 97-1 at ¶¶ 102-107. He further asserted that Encore continues to lose sales because of Dr. Kennedy's alleged failure to honor his contractual obligations. *Id.* at ¶ 102. Given that Encore has produced evidence of at least one lost sale, the "procurement" claims asserted against Miscoe and his companies must be resolved by a trier of fact.[12] ECF No. 48 at ¶¶ 188-198. The

---

[11] Miscoe maintains that the tables manufactured and sold by Encore are "substantively different" from the ones "designed and sold by Mir-Com." ECF No. 92 at 15.

[12] Encore accuses Miscoe of obstructing the discovery process in order to defeat its motion for summary judgment. ECF No. 102 at 19. Since the existing record contains sufficient evidence to create a triable issue as to Encore's

motion for summary judgment filed by Miscoe, Bryanne, Mir-Com and MRP will be denied with respect to those claims. ECF No. 91 at ¶ 1.

In Count VII of the second amended complaint, Encore asserts claims against all five defendants for civil conspiracy. ECF No. 48 at ¶¶ 204-210. In order to prevail on these claims, Encore must demonstrate that Dr. Kennedy and Miscoe "acted in concert to commit an unlawful act or to do a lawful act by unlawful means, and that they acted with malice." *Skipworth v. Lead Industries Association, Inc.*, 690 A.2d 169, 174 (Pa. 1997). The Court has already concluded that genuine issues of material fact exist as to whether Dr. Kennedy breached his contractual obligations to Encore, and as to whether the alleged breach was unlawfully induced or procured by Miscoe. In *Reading Radio, Inc. v. Fink*, 833 A.2d 199, 212-213 (Pa. Super. Ct. 2003), the Pennsylvania Superior Court held that a plaintiff can sustain a cause of action for civil conspiracy by showing that an individual with no direct contractual obligations has induced an individual bound by a noncompetition covenant to breach that covenant. In accordance with the holding in *Reading Radio, Inc.*, the Defendants' motions for summary judgment will be denied with respect to Encore's civil conspiracy claims. ECF No. 88 at ¶ 1(g); ECF No. 91 at ¶ 3.

### E. The Alleged Interference with Encore's Prospective Business Relations

On June 10, 2011, a 27-year-old female patient was being treated at a chiropractic clinic located in St. Paul, Minnesota. ECF No. 105-25 at 3. She was immobilized on a "Triton DTS TRT-600," which had been manufactured by the Chattanooga Group. *Id.* at 4. During the course of the visit, the woman's 18-month-old son crawled beneath the machine and inadvertently pressed a button. *Id.* at 3. The compression of the button caused the machine to move downward, crushing the child to death. *Id.*

---

pecuniary damages, the Court has no occasion to consider whether the parties' discovery-related disputes would otherwise render the entry of summary judgment inappropriate.

An article about the incident authored by Dr. Kennedy was published in Volume 29,

Issue 16, of *Dynamic Chiropractic* on July 29, 2011. ECF No. 105-14 at 2-4. In his article, Dr.

Kennedy stated as follows:

> The TRT-600 is the Chattanooga Group's DTS (Decompression Traction System) and has been a popular offering of the now California-based conglomerate since 2007. There are warnings in the instruction manual to not let children under the table; however, after several years of use, we clinicians often become "desensitized" to otherwise relatively large safety risks. One should never assume that since it hasn't happened, it won't happen—or worse, "that is just won't happen to me!" Having been associated with various manufacturers over the past two decades, I have had many discussions regarding the injury potential of the exposed "scissor-lift" mechanism.
>
> Manufacturers that have understood the safety issues have opted unequivocally for a single-pedestal design with no exposed scissor mechanism, and have limited the downward travel of the table system and caudal surfaces. They had foreseen potential "crush" injuries and felt it necessary to limit that risk as thoroughly as is possible.
>
> This is perhaps just another of many examples of a product design that will not be changed until a trial lawyer sues the company that made it. In my opinion, the scissor mechanism and floor controls should have been closed and protected. Children being in a room with a parent is foreseeable, as is their inherent curiosity. Sadly, it may take a tragedy like this to get a jury to teach the DC and the product maker why safety should always be job one.
>
> If you own one of these tables, you should request it be modified ASAP (perhaps even before you are required) to prevent children from access to the dangerous mechanism. Relocating the foot switch only makes sense as well.
>
> Without intent and forethought is the problem. Ford Motor Co. didn't intend for its Pintos to burst into flames in rear-end collisions, but they did. Ford knew the inherent risks beforehand, and yet made a conscious decision, forethought, to save $7 per Pinto by leaving out a plastic fuel tank projector. It took the death of a beautiful young woman and a multimillion-dollar verdict in Corpus Christi, Texas, to force a design change that saved thousands of other lives.
>
> Before anti-tipover devices were required for kitchen stoves, hundreds of innocent children were horribly burned. The device only cost $2 to include with new stoves. Only after being hit with several multimillion-dollar verdicts did stove manufacturers begin including the anti-tip device.

When the parents of the child killed on June 10 begin to heal from the initial shock, their anger may surface in a lawsuit against both the DC and the manufacturer. It is my opinion that the evidence will likely establish that in order to save a few dollars in manufacturing costs, no child protective devices were installed.

*Id.* at 3-4. Encore avers that Dr. Kennedy repeated the statements made in his article on October 1, 2011, while speaking at the Pennsylvania Chiropractic Association's annual convention. ECF No. 48 at ¶ 151. Dr. Kennedy's lecture was sponsored by Bryanne. *Id.* at ¶ 152. The convention was held in Tannersville, Pennsylvania. ECF No. 48-9 at 6.

In Count X of the second amended complaint, Encore asserts claims against all five defendants for intentionally interfering with its prospective business relations. ECF No. 48 at ¶¶ 228-242. Under Pennsylvania law, "the encouragement of one not to enter into a contract or business relationship with another is an actionable tort." *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 470 (Pa. 1979). The Tennessee Supreme Court adopted a similar rule in *Trau-Med of America, Inc. v. Allstate Insurance Co.*, 71 S.W.3d 691, 701 (Tenn. 2002).

Encore insists that its "interference" claims should be governed by Tennessee law. Indeed, its averments appear to track the language used by the Tennessee Supreme Court in *Trau-Med.* ECF No. 48 at ¶ 236; *Trau-Med*, 71 S.W.3d at 701, n. 5. When Dr. Kennedy's article was published, however, the Chattanooga Group's Tennessee facility had already closed. ECF Nos. 95 & 98 at ¶¶ 5-6. The magazine containing Dr. Kennedy's article was circulated to 58,999 chiropractors and 459 chiropractic suppliers throughout the United States. ECF No. 105-14 at 5. Among the recipients, 769 chiropractors and six chiropractic suppliers were located in Tennessee. *Id.* In contrast, 2,951 chiropractors and 18 chiropractic suppliers located in Pennsylvania received copies of the magazine. *Id.* Dr. Kennedy's subsequent lecture was given in Pennsylvania. ECF No. 48-9 at 6. The fact that some Tennessee residents received copies of

Dr. Kennedy's article "was merely a fortuitous circumstance." *Hataway*, 830 S.W.2d at 60. As the District Court noted in transferring this case, the Defendants' "alleged conspiracy to lure customers away from Encore products" occurred in Pennsylvania. *Encore*, 861 F.Supp.2d at 896. Under these circumstances, Tennessee's choice-of-law rules require the application of Pennsylvania's substantive law. *Hataway*, 830 S.W.2d at 60.

In order to establish an actionable "interference" claim under Pennsylvania law, Encore must demonstrate that: (1) it had "prospective contractual relationships" with those who received Dr. Kennedy's article or heard his lecture; (2) Dr. Kennedy and Miscoe had the "purpose or intent to harm" Encore in preventing those relationships from forming; (3) Dr. Kennedy's statements were not privileged or justified; and (4) Encore suffered actual damages as a result of Dr. Kennedy's statements. *Phillips*, 959 A.2d at 428. "The third element contains the requirement that the plaintiff allege the absence of privilege or justification. This requirement mandates that the plaintiff provide proof that the defendant's actions were improper." *Foster v. UPMC South Side Hospital*, 2 A.3d 655, 666 (Pa.Super.Ct. 2010). Unlike the rules applicable in other jurisdictions, which treat justification as an affirmative defense, Pennsylvania law requires the plaintiff "to show that the defendant's conduct was *not* justified." *Triffin*, 626 A.2d at 574, n. 3 (emphasis added).

In *Walnut Street Associates, Inc. v. Brokerage Concepts, Inc.*, 20 A.3d 468, 374-390 (Pa. 2011), the Pennsylvania Supreme Court held that a defendant's truthful statements cannot result in liability for any resulting interference in a plaintiff's prospective business relations. The decision in *Walnut Street Associates, Inc.*, appears to have been influenced, at least in part, by a concern that a rule permitting the imposition of liability for the provision of truthful information would run afoul of the First and Fourteenth Amendments to the United States Constitution.

44

*Walnut Street Associates, Inc.*, 20 A.3d at 474, n. 6 (making reference to the defendant's invocation of the canon of constitutional avoidance). Encore contends that Dr. Kennedy's article "was not an attempt to objectively educate the public," and that it was "an inexcusable attempt to use a tragic and horrible accident to garner publicity for and sales of the Kennedy Tables." ECF No. 102 at 27. By this averment, Encore does not allege that Dr. Kennedy's statements were not truthful.[13] Moreover, the fact that Dr. Kennedy may have had a "financial interest" in selling a competing product weighs in favor, rather than against, his position. The RESTATEMENT (SECOND) OF TORTS specifically recognizes that an individual with such a "financial interest in the business of a third person" may legitimately "act[] to protect his [or her] interest from being prejudiced by the relation" allegedly interfered with. RESTATEMENT (SECOND) OF TORTS § 769. Pennsylvania courts have fashioned the relevant cause of action in accordance with the RESTATEMENT. *Foster*, 2 A.3d at 665. On the basis of the existing record, Encore is unable to establish that Dr. Kennedy was "not justified" in writing the article since his statements have neither been alleged as or shown to be false. *Triffin*, 626 A.2d at 574, n. 3. Thus, Defendants are entitled to summary judgment with respect to Count X of the second amended complaint. ECF No. 48 at ¶¶ 228-242; ECF No. 88 at ¶ 1(j); ECF No. 91 at ¶ 6.

The contract executed between Dr. Kennedy and Encore contains provisions governing Dr. Kennedy's use of "confidential information." ECF No. 1-1 at 38. In the factual averments supporting Count X, Encore characterizes the Defendants' conduct as the "misuse of inside or confidential information." ECF No. 48 at ¶ 236. The Court has already concluded that genuine issues of material fact exist as to whether Dr. Kennedy has breached his contractual obligations

---

[13] The second amended complaint contains an averment suggesting that Encore's "TRT-600" used a different "lift mechanism" than the one attacked in Dr. Kennedy's article. ECF No. 48 at ¶ 139. Nonetheless, Encore does not deny that the specific incident discussed by Dr. Kennedy involved a TRT-600, and that the vulnerability described in the article contributed to the 18-month-old boy's death.

45

to Encore, and as to whether Miscoe has unlawfully "procured" or "induced" that breach. If "confidential information" was wrongfully disclosed in Dr. Kennedy's article or ensuing lecture, Encore remains free to buttress its breach-of-contract and "procurement" claims by relying on such disclosures. ECF No. 48 at ¶¶ 83-87. The construction of the contract, which is governed by Tennessee law, involves issues separate and distinct from the issue of "privilege" or "justification" under Pennsylvania law. *Triffin*, 626 A.2d at 574. The Court holds that Dr. Kennedy's article and lecture about the tragedy in Minnesota cannot provide a basis for liability independent of the contract itself. Count X of the second amended complaint will be dismissed. ECF No. 48 at ¶¶ 228-242.

## F. The Claims Arising Under the Tennessee Consumer Protection Act

The Tennessee Consumer Protection Act ("TCPA") [TENN. CODE ANN. § 47-18-101 *et seq.*] provides that "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce constitute unlawful acts or practices . . . ." TENN. CODE ANN. § 47-18-104(a). An individual or entity runs afoul of this prohibition by "[c]ausing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services," "[r]epresenting that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another," or "[d]isparaging the goods, services or business of another by false or misleading representations of fact." TENN. CODE ANN. § 47-18-104(b)(2), (7), (8). The TCPA plainly states that "[t]he powers and remedies provided [therein] shall be cumulative and supplementary to all other powers and remedies otherwise provided by law," and that "[t]he invocation of one power or remedy [t]herein shall not be construed as excluding or prohibiting the use of any other available remedy." TENN. CODE ANN. § 47-18-112. In view of this language, the same event (or sequence of events) can give rise to both breach-of-

46

contract claims under the common law and tort claims under the TCPA. *Akers v. Buckner-Rush Enterprises, Inc.*, 270 S.W.3d 67, 74-75 (Tenn. Ct. App. 2007).

The provisions providing aggrieved parties with a private right of action are codified at TENN. CODE ANN. § 47-18-109(a)(1)-(2). The applicable statutory language provides:

**47-18-109. Private right of action—Damages—Notice to division.**
**(a)(1)** Any person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice described in § 47-18-104(b) and declared to be unlawful by this part, may bring an action individually to recover actual damages.
**(2)** The action may be brought in a court of competent jurisdiction in the county where the alleged unfair or deceptive act or practice took place, is taking place, or is about to take place, or in the county in which such person resides, has such person's principal place of business, conducts, transacts, or has transacted business, or, if the person cannot be found in any of the foregoing locations, in the county in which such person can be found.

TENN. CODE ANN. § 47-18-109(a)(1)-(2). Willful violations of the TCPA can result in an award of treble damages. TENN. CODE ANN. § 47-18-109(a)(3). An award of treble damages cannot be accompanied by an award of "exemplary or punitive damages for the same unfair or deceptive practice." *Id.* The TCPA defines the term "person" as "a natural person, individual, governmental agency, partnership, corporation, trust, estate, incorporated or unincorporated association, and any other legal or commercial entity however organized." TENN. CODE ANN. § 47-18-103(13). Because the term "person" is defined broadly enough to include corporations, the Tennessee Supreme Court held in *ATS Southeast, Inc. v. Carrier Corp.*, 18 S.W.3d 626, 630 (Tenn. 2000), that corporations have standing to bring actions for treble damages under the TCPA. Encore asserts TCPA claims against the Defendants for "disparaging" its goods or services, misrepresenting the "standard, quality, or grade" of such goods or services, and "caus[ing] the likelihood of confusion or of misunderstanding as to the source, sponsorship,

47

approval, or certification" of those goods or services. ECF No. 48 at ¶¶ 220-222. These claims are based on statements allegedly made by (or attributed to) Dr. Kennedy and Miscoe during chiropractic seminars, in advertisements for chiropractic products, and on various websites.[14] ECF No. 48 at ¶¶ 221-222.

The Defendants argue that they did not engage in "trade or commerce" for purposes of the TCPA. ECF No. 89 at 26-28; ECF No. 92 at 32. This argument appears to be based on a belief that only sales of "goods"[15] or "services"[16] can bring an individual or entity within the TCPA's provisions. Contrary to the Defendants' belief, the terms "[t]rade" and "commerce" extend to "the advertising, offering for sale, lease or rental, or distribution of any goods, services, *or property, tangible or intangible, real, personal, or mixed, and other articles, commodities, or things of value wherever situated.*" TENN. CODE ANN. § 47-18-103(19) (emphasis added). Furthermore, Encore is not precluded from proceeding under the TCPA simply because it may not qualify as a "consumer."[17] *ATS Southeast, Inc.*, 18 S.W.3d at 629 ("As previously implied, it is irrelevant whether a corporation is a 'consumer' under the Act because the right of action is given to 'persons,' a term that is specifically defined to include corporations.").

Miscoe, Bryanne, Mir-Com and MRP rely on the TCPA's venue provision as a basis for challenging the Court's subject-matter jurisdiction over Encore's TCPA claims. ECF No. 92 at

---

[14] Although Dr. Kennedy's name and photograph appear on various websites pertaining to products marketed by Miscoe's companies, Dr. Kennedy maintains that he "has no control over the content of any of these websites" and has not been "consulted about the website contents." ECF No. 98 at 15, ¶¶ 132-168. Dr. Kennedy also asserts that he "has never clicked on any of the[] websites" referenced in Encore's "statement of undisputed facts." *Id.*

[15] The TCPA defines the term "[g]oods" to mean "any tangible chattels leased, bought, or otherwise obtained for use by an individual primarily for personal, family, or household purposes or a franchise, distributorship agreement, or similar business opportunity." TENN. CODE ANN. § 47-18-103(7).

[16] The TCPA defines the term "[s]ervices" to mean "any work, labor, or services including services furnished in connection with the sale or repair of goods or real property or improvements thereto." TENN. CODE ANN. § 47-18-103(18).

[17] The TCPA defines the term "[c]onsumer" as "any natural person who seeks or acquires by purchase, rent, lease, assignment, award by chance, or other disposition, any goods, services, or property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situated or any person who purchases or to whom is offered for sale a franchise or distributorship agreement or any similar type of business opportunity." TENN. CODE ANN. § 47-18-103(2).

48

30. The premise for this argument is that "all of the alleged acts took place in Pennsylvania." *Id.* Although the logic of their contention is somewhat unclear, these defendants apparently believe that the Tennessee courts lacked subject-matter jurisdiction over Encore's TCPA claims, and that this jurisdictional defect could not have been cured by a transfer ordered pursuant to § 1404(a). The TCPA's venue provision, however, broadly refers to any county in which a defendant "has transacted business." TENN. CODE ANN. § 47-18-109(a)(2). The Court does not understand Miscoe to argue that he and his companies have never "transacted business" in Tennessee. Indeed, the District Court determined that the Defendants' interactions with Tennessee customers had been sufficient to establish its *in personam* jurisdiction over them before transferring this case. *Encore*, 861 F.Supp. 2d at 890-894.

The United States Supreme Court has recently tried "'to bring some discipline to the use' of the term 'jurisdiction.'" *Sebelius v. Auburn Regional Medical Center*, 133 S.Ct. 633, 184 L.Ed.2d 627, 637 (2013), quoting *Henderson v. Shinseki*, 131 S.Ct. 1197, 1203, 179 L.Ed.2d 159 (2011). The term has frequently been employed to mean different things in different contexts. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 90, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). Under the circumstances of this case, the relevant question appears to be one of *legislative* jurisdiction rather than one of *adjudicatory* jurisdiction. The United States Constitution provides some limitations on a State's ability to make its own laws applicable to persons or entities outside of its borders. *Phillips Petroleum Co.*, 472 U.S. at 818-819 (referring to limitations imposed by the Full Faith and Credit Clause and the Due Process Clause). The applicability of a State's laws to the conduct of nonresident parties raises an issue separate and distinct from the jurisdiction of its courts over those parties. *Shaffer*, 433 U.S. at 215 (rejecting "the argument that if a State's law can properly be applied to a dispute, its courts necessarily

49

have jurisdiction over the parties to that dispute"). In *Freeman Industries, L.L.C. v. Eastman Chemical Co.*, 172 S.W.3d 512, 521 (Tenn. 2005), the Tennessee Supreme Court explained that broadly-worded state statutes must not be construed to reach beyond the General Assembly's "constitutionally permitted scope of authority." Speaking through Justice Holder, the Tennessee Supreme Court observed that when "a statute includes terms that are overly broad, courts have a duty to limit [its] application to circumstances within the legislature's intent." *Freeman Industries, L.L.C.*, 172 S.W.3d at 521. The reasoning employed in *Freeman Industries, L.L.C.*, suggests that the TCPA should not be interpreted to reach every conceivable "deceptive[] act or practice[]" falling within the statute's terms, irrespective of whether those acts occur in Tennessee. TENN. CODE ANN. § 47-18-104(a).

In situations involving the sale of products throughout a national market, it is certainly possible (if not likely) that multiple States will have legislative jurisdiction over the conduct of business competitors. *Sun Oil Co. v. Wortman*, 486 U.S. 717, 727, 108 S.Ct. 2117, 100 L.Ed.2d 743 (1988) (affording "both the forum State and other interested States the legislative jurisdiction to which they are entitled"). In this case, the Court has no occasion to consider the outer limits of Tennessee's legislative jurisdiction over the conduct of Dr. Kennedy, Miscoe, Bryanne, Mir-Com and MRP. The relevant question is whether the TCPA can be reasonably construed to prohibit the allegedly "[u]nfair or deceptive acts" described by Encore. TENN. CODE ANN. § 47-18-104(a). Both the language of the TCPA and the jurisprudence of the Tennessee courts indicate that the TCPA prohibits only "acts or practices" occurring within Tennessee's borders.

The TCPA contains a provision prohibiting contracting parties from waiving its requirements. The relevant provision is TENN. CODE ANN. § 47-18-113(b), which provides:

**47-18-113.  Waiver of rights—Restrictions on jurisdiction or venue prohibited.**

\*\*\*

**(b)** Any provision in any agreement or stipulation, verbal or written, restricting jurisdiction or venue to a forum outside this state or requiring the application of the laws of another state with respect to any claim arising under or relating to the Tennessee Consumer Protection Act and related acts set forth in this title is void as a matter of public policy. Further, no action of a consumer or other person can alter, amend, obstruct or abolish the right of the attorney general and reporter to proceed to protect the state of Tennessee and consumers or other persons within this state or from other states who are victims of *illegal practices of persons located, wholly or in part, in Tennessee's borders*.

TENN. CODE ANN. § 47-18-113(b) (emphasis added).  This statutory language suggests that conduct must take place within "Tennessee's borders" in order to be governed by the TCPA.  In this vein, the Tennessee Court of Appeals stated in *Timoshchuk v. Long of Chattanooga Mercedes-Benz*, No. E2008-01562-COA-R3-CV, 2009 WL 3230961, at \*9, 2009 Tenn.App. LEXIS 672, at \*26 (Tenn. Ct. App. Oct. 8, 2009), that "Tennessee consumers may use the TCPA to sue foreign corporations as long as the deceptive or unfair act complained of occurred in Tennessee."

Robert S. Jones ("Jones") and his wife are the co-owners of B&D Enterprise of Texas ("B&D"), which is located in Grand Prairie, Texas.  ECF No. 105-12 at ¶ 2.  B&D serves as Encore's distributor for chiropractors practicing in Texas.  *Id.* at ¶ 4.  In an affidavit signed on November 5, 2009, Jones described an email that he had received from Dr. Cynthia Vaughn and Dr. James Edwards on June 11, 2009.  *Id.* at ¶ 21.  The email stated as follows:

The news that the Chattanooga Group has decided to "fold it's (sic) tent" at it's (sic) primary facility in Chattanooga TN and move its manufacturing out of the country to Tijuana, Mexico was not a total surprise to us and reinforces our decision to recommend the KDT System.

We've been aware for some time of Chattanooga's falling sales and a series of product failures.  These include the suspension of the new Adapta table line,

51

> reported problems with certain products in their chiropractic table and laser lines, and the safety concerns associated with the FDA mandated recall of certain Chattanooga electro-therapy products, primarily in the flagship Genisys line.

*Id.* The message was apparently sent to more than 32,000 chiropractors. *Id.* at ¶ 22. Viewing the information contained in the email as a misrepresentation and fearing that it would interfere with B&D's sales of the Chattanooga Group's products, Jones emailed his customers "in an attempt to dispel the false information." *Id.* at ¶ 23. According to Jones, Dr. Edwards responded with an email claiming that Jones' comments had constituted "baseless allegations." *Id.* Jones further declared that a "rebuttal" from Miscoe had been attached to Dr. Edwards' message. *Id.* Miscoe had allegedly authored the "rebuttal" in his capacity as Bryanne's President. *Id.*

In addition to the email reportedly sent by Dr. Vaughn and Dr. Edwards, Jones described an incident in Dallas, Texas, in which Miscoe had allegedly criticized the Chattanooga Group for closing its facility in Tennessee and relocating its operations to Tijuana, Mexico. *Id.* at ¶¶ 20-21. Although Jones was not present for the seminar in which Miscoe is alleged to have spoken, he attributed his knowledge of the incident to text messages sent to him by Dr. Curtis Turchin. *Id.* at ¶¶ 14-20. The tenor of Dr. Turchin's text messages apparently led Jones to believe that Dr. Kennedy and Miscoe were working together to promote sales of the "Kennedy Decompression System." *Id.* at ¶ 15. Jones received the text messages while attending a meeting in Houston, Texas, in October 2009. *Id.* at ¶ 13. He concluded his affidavit by stating that "the continued disparagement of the Chattanooga Group by those affiliated with Dr. Kennedy [wa]s negatively affecting the ability of [his] company and [his] sales representatives to effectively market and sell [the] Chattanooga Group's decompression products" in Texas. *Id.* at ¶ 27.

The incidents described by Jones did not *occur in Tennessee*. Therefore, they cannot serve as a predicate for Encore's TCPA claims. *Timoshchuk,* 2009 WL 3230961, at *9, 2009

52

Tenn.App. LEXIS 672, at *26. To the extent that Encore believes that it can proceed against the Defendants under the TCPA simply because its contract with Dr. Kennedy is governed by Tennessee law, it is mistaken. In order to sustain a cause of action under the TCPA, Encore must establish that the Defendants "engage[d] in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within [Tennessee]." TENN. CODE ANN. § 47-18-102(2). Most of the alleged conduct supporting Encore's TCPA claims occurred after the Chattanooga Group had already closed its Tennessee facility. The TCPA cannot reasonably be construed to govern conduct occurring throughout the entire United States simply because it somehow relates to a business that was, at one time, located in Tennessee. *Freeman Industries, L.L.C.*, 172 S.W.3d at 521. Encore makes no attempt to link the alleged "disparagement" of its products to transactions involving Tennessee residents.

Under normal circumstances, the Court would be inclined to dismiss Encore's TCPA claims. The present circumstances, however, require a different course of action. During a status conference conducted on April 11, 2012, the parties expressed disagreement as to whether additional discovery was needed. ECF No. 85 at 2. In light of the disagreement, the Court directed the parties to "refrain from conducting discovery" until after the issuance of an "order detailing how the case w[ould] proceed." *Id.* The next day, an order was entered instructing the parties to file their respective motions for summary judgment by May 14, 2012. ECF No. 86 at 1. The order stated that a status conference would be scheduled within twenty-one days after the rendering of a decision disposing of motions for summary judgment, and that the Court would "address at this status conference whether limited additional discovery [wa]s necessary in light of the summary judgment decision." *Id.* at 2.

53

Encore complains that it needs additional discovery in order to tie its TCPA claims to specific transactions occurring in Tennessee. ECF No. 102 at 23. Some of the parties' discovery disputes remain unresolved. ECF No. 105-1. Shortly after the case was transferred to this Court, the parties were instructed to "raise any issues ripe for summary judgment" in their respective filings. ECF No. 86 at 1. The case proceeded to summary judgment because the parties sought a faster resolution of the motions that had been filed prior to the transfer. *Id.* at 1-2. The Court understands Encore to argue that its TCPA claims are not "ripe for summary judgment" at the present time. ECF No. 102 at 23.

In fairness to the parties, the Defendants' motions for summary judgment will be denied *without prejudice* as to Encore's TCPA claims. ECF No. 88 at ¶ 1(i); ECF No. 91 at ¶ 5. The Court will not dismiss Count IX of the second amended complaint at this time. ECF No. 48 at ¶¶ 219-227. Pursuant to the earlier order, a status conference will be held to discuss whether "*limited* additional discovery" is needed. ECF No. 86 at 2 (emphasis added). Encore will be afforded a fair opportunity to explain whether it has reason to believe that the Defendants engaged in "[u]nfair or deceptive acts or practices" affecting the conduct of "trade or commerce" *in Tennessee.*[18] TENN. CODE ANN. § 47-18-104(b). The claims arising under the TCPA will be more appropriately addressed after the parties' discovery disputes are settled.

---

[18] The TCPA contains a provision permitting an order requiring a plaintiff to indemnify a defendant "for any damages incurred, including reasonable attorney's fees and costs," upon a finding that an action commenced thereunder "is frivolous, without legal or factual merit, or brought for the purpose of harassment." TENN. CODE ANN. § 47-18-109(e)(2). Now that the Court has clarified the scope of the TCPA for purposes of this case, Encore should proceed with its TCPA claims only if it reasonably believes that Dr. Kennedy and Miscoe have engaged in prohibited conduct falling within that statute's sphere of governance. The Court expresses no opinion as to whether the conduct of Dr. Kennedy and Miscoe, if sufficiently related to Tennessee to be *governed by* the TCPA's provisions, would otherwise *violate* those provisions. ECF No. 92 at 32-36. That issue can be addressed after a determination is made as to whether additional discovery is needed. ECF No. 86 at 2.

## G. The "Counts" Requesting Specific Performance and Injunctive Relief

In Counts IV and XI of the second amended complaint, Encore seeks the remedies of "specific performance" and "injunctive relief." ECF No. 48 at ¶¶ 186-187, 243-246. The Defendants move for summary judgment with respect to those counts. ECF No. 88 at ¶ 1(d), (k); ECF No. 91 at ¶ 7. Counts IV and XI are not really *claims* entitling Encore to relief. *Steinberg v. Gray*, 815 F.Supp. 2d 293, 303, n. 9 (D.D.C. 2011). Instead, they are simply *remedies* available to redress the claims asserted in other portions of the complaint. *Dunkin' Donuts, Inc. v. N.A.S.T., Inc.*, 428 F.Supp.2d 761, 775 (N.D.Ill. 2005). As explained earlier, there are genuine issues of material fact as to whether Dr. Kennedy breached his agreement with Encore, and as to whether such a breach was unlawfully procured by Miscoe. Paragraph #7 of the agreement specifically provides that Encore "shall be entitled to injunctive and other equitable relief or damages, in addition to any other rights and remedies available to it," in the event of a breach by Dr. Kennedy. ECF No. 1-1 at 39. At this juncture, the Court cannot conclude as a matter of law that Encore is not entitled to the remedies of specific performance and injunctive relief. The availability (or unavailability) of those remedies will be more appropriately addressed after Encore's claims are finally resolved. The Defendants' motions for summary judgment will be denied with respect to Counts IV and XI. ECF No. 88 at ¶ 1(d), (k); ECF No. 91 at ¶ 7.

## H. Encore's Motion to Dismiss

Dr. Kennedy and the remaining defendants separately answered the second amended complaint on January 3, 2012. ECF Nos. 55 & 56. On January 24, 2012, Dr. Kennedy amended his answer in order to assert a counterclaim against Encore for abuse of process. ECF No. 60 at 22-36, ¶¶ 1-67. Encore filed a motion to dismiss on February 7, 2012, seeking the dismissal of

55

Dr. Kennedy's counterclaim. ECF No. 65. That motion remains pending at the present time. ECF No. 86.

Dr. Kennedy avers that the tables marketed by Mir-Com were introduced in March 2009. ECF No. 60 at 23, ¶ 8. Encore commenced this action against Dr. Kennedy on April 1, 2009. ECF No. 97-26 at 2-24. Dr. Kennedy alleges that this lawsuit was commenced for the specific purpose of "hitting" him for competing against Encore's products. ECF No. 60 at 24, ¶ 11. He also asserts that Encore filed the amendment adding Count X in order to silence the criticism conveyed in his article of July 29, 2011. *Id.* at 31, ¶¶ 46-48. In addition, Dr. Kennedy maintains that Encore sued him, Miscoe and Miscoe's companies in order to destroy their business opportunities and increase its own market share. *Id.* at 32-36, ¶¶ 51-67.

Five days after Encore commenced this action against Dr. Kennedy, Jones emailed a chiropractor who had ordered a "Kennedy Table," made reference to the lawsuit, and recommended that the chiropractor get a "written money back guarantee" in order to protect his "investment." ECF No. 60-1 at 44. In an email to Peetros sent on June 11, 2009, Hofstatter expressed a desire to "get [M]iscoe at some point." *Id.* at 21. On June 16, 2009, Hofstatter emailed a message to Don Roberts and Jeff Clark, who served on Encore's legal staff. *Id.* at 19. In his message, Hofstatter stated as follows:

> Don, Jeff, if there is any doubt about the negative impact these idiots can have on our business this may help . . . . Read below. Edwards/Miscoe/Kennedy sent a broadcast to 32,000 DOCTORS slamming us!!! I just spent 45 minutes on the phone with Bob Jones (our loyal dealer) salvaging a 20 unit order of DTS Traction tables ($120,000k order)!! He is feeling uneasy about taking inventory and getting stuck due to this madness. We need to hit Miscoe and Edwards along with Kennedy. $$$$ will be the only way they will be silenced. Otherwise our DTS business will suffer for some time to come. The below email chain should offer MORE ammo against Edwards/Miscoe/Kennedy. We will fight a field battle that is informative, ethical and will continue a selling strategy that protects us the best we can, but we clearly need the legal battle in the background . . . When is a good time to catch up?

*Id.* These emails apparently provide the evidentiary basis for Dr. Kennedy's abuse of process claim.

Under Tennessee law, "'[t]he distinctive nature of an action for abuse of process, as compared with an action for malicious prosecution, is that the former lies for the improper use of process *after* it has been issued, not for maliciously causing process to issue.'" *Priest v. Union Agency*, 125 S.W.2d 142, 143 (Tenn. 1939) (emphasis added), quoting 1 AM. JUR., ABUSE OF PROCESS, § 3, p. 176. In *Bell v. Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A.*, 986 S.W.2d 550, 556 (Tenn. 1999), the Tennessee Supreme Court held that a cause of action for abuse of process accrues only when a litigant commits an "improper act in the use of process" *after* an action has already been commenced. The Tennessee Supreme Court's later decision in *Givens v. Mullikin*, 75 S.W.3d 383, 403 (Tenn. 2002) (emphasis in original), confirmed that this "additional use requirement" requires a plaintiff to "show some additional use of process after the *original* processes of the court."[19] The "original processes of the court" referred to in *Givens* include "the complaint, summons, and responsive pleadings." *Givens*, 75 S.W.3d at 403.

Dr. Kennedy's counterclaim against Encore is based entirely on the initiation of this action on April 1, 2009, and the addition of Count X on December 19, 2011. ECF No. 60 at 22-36, ¶¶ 1-67. In other words, the claim is based solely on Encore's "pleadings." FED. R. CIV. P. 7(a)(1)(classifying a "complaint" as a "pleading"). It is not premised on "an improper act in the use of process" occurring *after* the pleadings stage. *Bell*, 986 S.W.2d at 556. Under Tennessee law, the filing of a complaint cannot cause an abuse of process claim to accrue. *Givens*, 75 S.W.3d at 403. This remains the case even if the filing of a complaint is "accompanied by a

---

[19] This requirement "serves to prevent a chilling effect on claims well-founded in fact and law and asserted for the legitimate purpose of redressing a grievance." *Bell v. Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A.*, 986 S.W.2d 550, 556 (Tenn. 1999).

malicious ulterior motive." *Bell*, 986 S.W.2d at 555. Dr. Kennedy's counterclaim "fail[s] to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Consequently, Encore's motion to dismiss will be granted. ECF No. 65.

## VI. CONCLUSION

For the forgoing reasons, Encore's motion for partial summary judgment (*ECF No. 94*) will be denied, and the motions for summary judgment filed by the Defendants (*ECF Nos. 88 & 91*) will be granted in part and denied in part.[20] Counts VI, VIII and X of the second amended complaint will be dismissed with prejudice. ECF No. 48 at ¶¶ 199-203, 211-218, 228-242. The Defendants' motions for summary judgment will be denied in all other respects.[21] Dr. Kennedy's motion to vacate (*ECF No. 12*) will be granted in part and denied in part. The injunction entered by the Circuit Court will be modified to prohibit Dr. Kennedy from competing only with sales of "the Product." ECF No. 24-1 at 10. To the extent that the injunction prohibits him from competing with sales of "the Machine," it will be vacated.[22] *Id.* Encore's motion to dismiss (*ECF No. 65*) will be granted. Shortly after the issuance of this decision, the status conference referenced in the Court's order of April 12, 2012, will be scheduled. ECF No. 86 at 2.

---

[20] To the extent that Dr. Kennedy's earlier motion for summary judgment (*ECF No. 10*) is not deemed to be incorporated within his second motion for summary judgment (*ECF No. 88*), it will be denied.

[21] As discussed earlier, the Defendants' motions for summary judgment will be denied *without prejudice* as to Count IX of the second amended complaint. ECF No. 48 at ¶¶ 219-227. Encore concedes that Count III can be consolidated with its breach-of-contract claim against Dr. Kennedy. ECF No. 101 at 17. Count III will remain in the case with that understanding. To the extent that Encore previously intended to pursue an independent claim against Dr. Kennedy based on his alleged breach of a "duty of loyalty," that claim is deemed to be abandoned. ECF No. 48 at ¶¶ 181-185.

[22] Encore can seek further injunctive relief if the trier of fact concludes that Dr. Kennedy remains subject to the noncompetition covenant as to "the Machine" through June 25, 2014. ECF No. 1-1 at 39.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ENCORE MEDICAL, L.P., )
)
    Plaintiff/Counterclaim Defendant, )
)
v. ) CIVIL ACTION NO. 3:12-58
) JUDGE KIM R. GIBSON
JAY KENNEDY, D.C., )
)
    Defendant/Counterclaimant, )
)
v. )
)
GEOFFREY MISCOE; MIR-COM )
PRODUCTS, L.L.C.; BRYANNE )
ENTERPRISES, INC.; *and* MIG )
RUNNER, L.L.C., *a/k/a MRP*, )
)
    Defendants. )

## ORDER

**AND NOW**, this 5th day of March, 2013, IT IS HEREBY ORDERED that: (1) the Motion to Vacate filed by Defendant Jay Kennedy (*ECF No. 12*) is **DENIED** with respect to the portion of the Circuit Court's injunction prohibiting competition with sales of "the Product" and **GRANTED** with respect to the portion of that injunction prohibiting competition with sales of "the Machine"; (2) the Motion to Dismiss filed by the Plaintiff (*ECF No. 65*) is **GRANTED**; (3) the Motions for Summary Judgment filed by the Defendants (*ECF Nos. 88 & 91*) are **GRANTED** with respect to Counts VI, VIII and X of the Second Amended Complaint (*ECF No. 48 at ¶¶ 199-203, 211-218, 228-242*) and **DENIED** in all other respects; (4) the Motion for Partial Summary Judgment filed by the Plaintiff (*ECF No. 94*) is **DENIED**; and (5)

the Circuit Court's injunction is **MODIFIED** to delete the language prohibiting Defendant Jay

Kennedy from competing with sales of "the Machine." ECF No. 24-1 at 10.

**BY THE COURT:**

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**

cc:    All counsel of record